Sally DOE; Mother Doe 1–3; Jane Doe; Mary Doe, Plaintiffs–Appellees,

v.

WARREN CONSOLIDATED SCHOOLS (03–1306); Paul Stamatakis, Dr. (03–1291); James Clor, Dr.; Jerry Maiorano (03–1292), Defendants–Appellants.

Nos. 03–1291, 03–1292, 03–1306.

United States Court of Appeals, Sixth Circuit.

March 24, 2004.

Before KENNEDY, DAUGHTREY, and COLE, Circuit Judges.

OPINION

COLE, Circuit Judge.

Defendants–Appellants Jerry Maiorano, James Clor, and Paul Stamatakis bring this interlocutory appeal from the February 13, 2002 order of the United States District Court for the Eastern District of

Michigan denying their motion for summary judgment and qualified immunity. The district court denied Defendants' motion for summary judgment on the ground that the facts would allow a reasonable jury to find that they deprived Plaintiffs— three elementary school-aged girls—of their constitutional right to be free from sexual abuse by a public school teacher, in violation of 42 U.S.C. § 1983. Defendant–Appellant, the Warren Consolidated Schools (the "School District"), asks us to exercise pendent appellate jurisdiction over its appeal of the district court's denial of its motion for summary judgment on Plaintiffs' § 1983 and Title IX claims.

For the reasons discussed below, we DISMISS Maiorano and Clor's appeals for lack of appellate jurisdiction; we AFFIRM the denial of qualified immunity and summary judgment as to Stamatakis; and we decline to exercise pendent appellate jurisdiction over the School District's interlocutory appeal and therefore DISMISS it.

## I. BACKGROUND

Plaintiffs, three young girls, were sexually molested by Defendant James Kearly in 1998, while they were students at Siersma Elementary School in Warren, Michigan, where Kearly was a teacher. In criminal proceedings, Kearly pleaded no contest to charges of Fourth Degree Criminal Sexual Conduct, in violation of Michigan law, and he is currently listed on the state of Michigan's Public Sex Offender Registry. Defendants do not dispute Plaintiffs' allegations of sexual molestation by Kearly.

On June 30, 2000, Plaintiffs filed this federal action claiming (1) violation of their constitutional rights pursuant to 42 U.S.C. § 1983; (2) sexual harassment pursuant to Title IX; and (3) gross negligence and intentional misconduct pursuant to Michigan law. Plaintiffs seek relief from the

Warren Consolidated Schools and the following individual defendants in addition to Kearly: Jerry Maiorano, Principal of Siersma Elementary School; James Clor, current Superintendent of the Warren Consolidated Schools and former Associate Superintendent in charge of elementary education; and Paul Stamatakis, former Superintendent of the Warren Consolidated Schools.

After discovery, all Defendants, except for Kearly, moved for summary judgment. In an order dated February 13, 2003, the district court dismissed the state law claim in its entirety and the Title IX claim against Maiorano, Clor, and Stamatakis. However, the district court denied summary judgment to all Defendants with respect to the § 1983 claim.

Maiorano, Clor, and Stamatakis have interlocutorily appealed the district court's denial of their motion for summary judgment. Specifically, they appeal the denial of their claim for qualified immunity with respect to the § 1983 claim, which alleges that, in neglecting their obligations as supervisors, they deprived Plaintiffs of their constitutional right to be free from sexual abuse by a public school teacher. In addition, the School District interlocutorily challenges the district court's denial of its motion for summary judgment on Plaintiffs' § 1983 and Title IX claims, and asks us to exercise pendent appellate jurisdiction over its appeal.

## II. DISCUSSION

### A. *Appellate Jurisdiction*

■ Plaintiffs contend that we lack appellate jurisdiction to consider Maiorano, Clor, and Stamatakis's interlocutory appeals. Typically, 28 U.S.C. § 1291 bars our review of interlocutory appeals, but there is an exception where the district court has denied a claim of qualified immu-

nity. *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). This exception, however, is a narrow one. A denial of a claim of qualified immunity is immediately appealable only if the appeal is premised not on a factual dispute, but rather on "neat abstract issues of law." *Johnson v. Jones,* 515 U.S. 304, 317, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) (citations omitted). Accordingly, a defendant is required to limit his argument to questions of law premised on facts taken in the light most favorable to the plaintiffs. We must dismiss the appeal if the defendant "attempts to persuade us to believe [his] version of the facts." *Berryman v. Rieger,* 150 F.3d 561, 565 (6th Cir.1998). In short, in order for this Court to exercise jurisdiction, the Defendants' appeals must be premised on evidence viewed in the light most favorable to Plaintiffs and they must contend that, viewing the evidence in that light, it fails to demonstrate violation of a clearly-established constitutional right.

The voluminous record in this case reveals Kearly's history of inappropriate conduct and illuminates to what extent Defendants knew about and responded to this conduct. In its comprehensive order of February 13, 2002, the district court set forth those facts in full and—pursuant to the standards governing review of a motion for summary judgment—properly construed those facts in the light most favorable to Plaintiffs, which is how we now must view them in considering our jurisdiction over the individual Defendants' appeals. As a result, we will recite only those facts relevant to our resolving the pending appeals.

### 1. *Jerry Maiorano*

Maiorano claims virtual ignorance of Kearly's history of misconduct and any disciplinary or precautionary actions taken by the School District in response to it. In his brief, Maiorano claims that he was unaware of most of Kearly's past misconduct and concedes only the vaguest awareness of "hearsay," "innuendo," and "rumors" about Kearly, all of which he "chose not to believe." (Maiorano and Clor Brief at 18.) Notwithstanding his acknowledgment that he was the only administrator assigned to Siersma Elementary School, Maiorano contends that he was unaware of the contents of Kearly's personnel file and simply assumed that Kearly had been properly screened by the School District. He claims that he "had no reason to believe that [Kearly] ... could have affected the safety of the kids." (*Id.* at 19.) He "does not recall" having conversations about Kearly with Clor or any other school official and he claims that "the Central Office never advised him of any problems that might exist with Kearly up to the time that the three Plaintiffs in this case came forward." (*Id.* at 20.) Maiorano further claims that he was unaware of Kearly being under any plan of supervision while at Siersma Elementary or under any form of discipline other than an out-of-cycle evaluation. (*Id.* at 20.) Finally, Maiorano contends that it was only in May and June of 1998. while doing an evaluation of Kearly, that he first learned that Kearly was prohibited from using older students to assist him without specific permission from the building principal. (*Id.* at 20.)

However, the evidence, which we must view in the light most favorable to Plaintiffs, paints a different picture. Indeed, the district court flatly rejected Maiorano's contention that he knew virtually nothing about Kearly's pattern of misconduct. According to the record, Maiorano and Kearly had a close friendship for over thirty years and that they remained close friends into the 1990s. Maiorano was Kearly's "drinking partner" and godfather to one of Kearly's children. Given Maiorano's admitted thirty-year friendship with Kearly

and Maiorano's high-ranking position in the same school system, a reasonable jury could conclude that he was aware of his friend's long history of improper behavior. As the district court also noted, that conclusion is supported by Maiorano's actions after Kearly was removed from Siersma Elementary School. After Maiorano learned of specific details surrounding the Plaintiffs' sexual molestation, Kearly was asked to remove his personal belongings from the building. On his way out, Kearly told Maiorano: "Love you, brother." Maiorano, who acknowledges that Kearly was hoping that he would cover for him. responded: "Don't worry about it, it's okay."

In addition, despite Maiorano's denial of having knowledge prior to May and June of 1998 about the prohibition on Kearly's working with student aides, the record suggests that Maiorano had been informed that Kearly was not allowed to use student aides when working with younger students. Yet the evidence indicates that Maiorano gave Kearly permission to use student aides. Kearly then assaulted Plaintiffs while they were aides in his gym class. Finally, the evidence also demonstrates that Maiorano knew that Kearly was subject to the unusual requirement of yearly evaluations.

Maiorano might have conceded those facts—as he is required to do in this interlocutory posture—and argued that despite his friendship with Kearly, his more-than-superficial knowledge of Kearly's misconduct, his knowledge of the prohibition on the use of student aides, and his knowledge of the School District's unusual imposition of yearly evaluations, he still acted in a manner that was constitutional and not deliberately indifferent to any danger posed by Kearly. But Maiorano makes no such legal argument. Instead, he disputes the district court's factual inferences at every turn, disregards the facts that are favorable to Plaintiffs, and reasserts his own ignorance and version of events. *Johnson* held that on interlocutory review, these types of factual disputes are left to the district court and are beyond this Court's appellate jurisdiction. Accordingly, we dismiss Maiorano's appeal.

### 2. James Clor

■ Like Maiorano, Clor claims virtual ignorance of Kearly's misconduct and refuses to concede the most favorable view of the facts to Plaintiffs for purposes of this interlocutory appeal. In his brief, Clor insists that prior to Plaintiffs' molestation by Kearly, he "was not made aware that Kearly had a history of prior incidents of inappropriate contact with students" until the Plaintiffs formally filed a complaint with the School District. (Maiorano and Clor Brief at 24.) Clor contends that he was "not informed of any condition placed on Kearly that he was not permitted to use older students to help supervise his classes." (*Id.* at 25.) The only incident Clor admits awareness of was in 1996, at the Harwood School, when he was present when several young female students were seen exiting the gymnasium where Kearly was teaching during a time when the students should have been in another class. On the basis of these facts, Clor argues that his conduct did not amount to deliberate indifference.

As with Maiorano, Clor's argument depends upon the factual conclusion that he had no knowledge of Kearly's past misconduct and no role in Kearly's supervision. But that ignores the facts as viewed in the light most favorable to Plaintiffs and as construed by the district court. The district court determined that "testimony from Marsha Pando, Associate Superintendent for Human Resources, taken in a light most favorable to plaintiffs, estab-

lishes that Clor was well aware of Kearly's long history of misconduct and inappropriate touching. . . ." Pando also testified that Clor was aware that Kearly was prohibited from touching students and from using student aides. In addition, the evidence suggests that Clor was placed in charge of making sure that Kearly was closely supervised. Clor also disputes the evidence, relied on by the district court, that he had witnessed Kearly kiss an elementary school girl on the lips and that he failed to take any disciplinary action against him.

As with Maiorano, Clor merely reasserts his ignorance about Kearly's past inappropriate conduct, thereby disregarding a view of the facts in the light most favorable to Plaintiffs and failing to raise a legal issue. Accordingly, we dismiss Clor's appeal for lack of jurisdiction.

### 3. *Paul Stamatakis*

■ Stamatakis, former Superintendent of the School District, was responsible for approving Kearly's transfer to Siersma Elementary School, where the molestation at issue here took place. Stamatakis's arguments present a clearer case for jurisdiction. In accordance with *Berryman*, Stamatakis's brief "overlook[s] any factual dispute and . . . concede[s] an interpretation of the facts in the light most favorable to the plaintiff's case." *Berryman*, 150 F.3d at 562. Stamatakis raises an issue of law by contending that "[t]he facts as portrayed by plaintiffs simply do not support a claim that Stamatakis deprived them of rights secured by the constitution. . . . [W]hen viewed in the light most favorable to plaintiffs, the facts demonstrate nothing more than mere negligence." (Stamatakis Brief at 40.)

Unlike Maiorano and Clor, Stamatakis accepts the facts as set forth by the district court and concedes that he was "not totally oblivious" to Kearly's past conduct and the concerns expressed by School District officials regarding Kearly's position as a school teacher. (Stamatakis Brief at 11–12.) Stamatakis contends that he gave "due consideration" to those concerns. (*Id.* at 12.) Ultimately, his brief raises the legal argument that his decision to transfer Kearly to Siersma Elementary School did not constitute a clearly-established constitutional violation grounded in deliberate indifference. Accordingly, we possess jurisdiction over Stamatakis's interlocutory appeal.

We respectfully disagree with the position, expressed by Judge Kennedy in her concurrence, that we lack appellate jurisdiction over Stamatakis's claim because issues of fact concerning his actions remain in dispute. Pursuant to *Johnson v. Jones*, 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995), the mere existence of disputed or unresolved facts does not preclude appellate jurisdiction so long as the defendant is willing to concede the facts in the light most favorable to the plaintiff for purposes of the interlocutory appeal. In *Berryman*, we gave this principle its most concise articulation:

> We hold that in order for . . . an interloctuory appeal based on qualified immunity to lie, the defendant must be prepared to overlook any factual dispute and to concede an interpretation of the facts in the light most favorable to the plaintiff's case.

*Berryman*, 150 F.3d at 562. The defendant must be willing to *overlook* any lingering factual disputes in order for us to exercise jurisdiction; but the record itself need not actually be dispute-free. *Cf. Salim v. Proulx*, 93 F.3d 86, 89–91 (2d Cir. 1996) ("[A] district court's mere assertion that disputed factual issues exist[ed] [is not independently sufficient] to preclude an immediate appeal. . . . [An immediate

appeal may be heard] where the defendant contends that on stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find, the immunity defense is established as a matter of law because those facts show either that he 'didn't do it' or that it was objectively reasonable for him to believe that his action did not violate clearly established law."). Indeed, if we required actual factual clarity at this stage, we would rarely, if ever, have interlocutory jurisdiction over appeals of this type.

Because we possess jurisdiction over Stamatakis's appeal, we turn now to the merits of his claim for qualified immunity.

### B. *Paul Stamatakis's Entitlement to Qualified Immunity*

Qualified immunity means that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In applying the doctrine, the Court must consider: (1) whether, based on the facts most favorable to the plaintiff, a constitutional violation has occurred; and (2) if so, whether the conduct violated a clearly established constitutional right of which a reasonable person would have known. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Burchett v. Kiefer,* 310 F.3d 937, 942 (6th Cir.2002).

As noted in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the injured party must allege more than an abstract right, such as the right to due process or the right to be free from excessive force pursuant to the Fourth Amendment. The right must be "clearly established" in a "more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Creighton,* 480 U.S. at 640, 107 S.Ct. 1442. As noted by the Sixth Circuit, however, a court "need not ... find a case in which 'the very action in question has previously been held unlawful,' but, 'in the light of pre-existing law[,] the unlawfulness must be apparent.'" *Comstock v. McCrary,* 273 F.3d 693, 702 (quoting *Creighton,* 483 U.S. at 640, 107 S.Ct. 3034); *see also Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

█ It is undisputed that the Due Process Clause of the Fourteenth Amendment protects the right of a child to be free from sexual abuse inflicted by a public school employee or teacher. *Doe v. City of Roseville,* 296 F.3d 431, 438 (6th Cir.2002). Plaintiffs' constitutional right to be free from sexual abuse was therefore clearly established at the time of the alleged abuse. Because this suit does not target Kearly himself, but rather his supervisors, who did not physically molest anyone, we evaluate whether Stamatakis's supervision subjects him to liability pursuant to 42 U.S.C. § 1983. *Roseville,* 296 F.3d at 439 (where plaintiff seeks to hold school administrators individually liable for constitutional injury caused by someone else, "supervisory liability" standards apply to the claims). A defendant cannot be found liable if he was merely "sloppy, reckless or negligent in the performance of [his] [supervisory] duties." *Roseville,* 296 F.3d at 439. Instead, a "plaintiff must show that, in light of the information the defendants possessed, the teacher who engaged in sexual abuse showed a strong likelihood that he would attempt to sexually abuse other students, such that the failure to

take adequate precautions amounted to deliberate indifference to the constitutional rights of students." *Id.* (quotations omitted).

■ Although Plaintiffs must reach a high threshold, the record reveals that Stamatakis's actions—specifically, his decision to transfer Kearly from a middle school to the elementary school position—amounted to "deliberate indifference" to Plaintiffs' constitutional rights. Stamatakis claims that he approved Kearly's transfer because he did not feel that the information contained in Kearly's personnel file supported tenure charges. Stamatakis notes that the School District—pursuant to a confounding and disturbing file-purging policy successfully bargained for by the teachers' union—had purged Kearly's personnel file, including many allegations of improper conduct, especially improper touching of students. Stamatakis claims to have made the best decision based on the information available to him and that his conduct amounts to nothing more than negligence or recklessness.

Pursuant to *Johnson,* the Court may "take, as given, the facts that the district court assumed when it denied summary judgment." *Johnson,* 515 U.S. at 319, 115 S.Ct. 2151. On May 19, 1995, while a teacher at Beer Middle School in the Warren School District, Kearly submitted a transfer request to the School District, seeking to teach physical education to elementary school students. Kearly. however, was initially denied the transfer on June 15, 1995. On June 22, 1995, Kearly's union filed a grievance on his behalf, arguing that Kearly should have been awarded the elementary physical education instructor position because he was the bidder with the most seniority. On July 20, 1995, Sharon Hughes, the District's Director of Personnel, sent a memorandum to Stamatakis "strongly urg[ing]" him to uphold the denial of the transfer in light of Kearly's history of sexual misconduct. Hughes included items from Kearly's file and noted: "We have a responsibility to the welfare of our students as well as district liability." With respect to Kearly's misconduct, Hughes wrote that the "incidents are severe enough and recent enough to warrant concern. I strongly urge that you support the administration's decision to deny his transfer to elementary physical education." In addition, Marsha Pando, Associate Superintendent of Human Resources, testified that Stamatakis attended high-level meetings prior to his making the decision to transfer Kearly. At these meetings, Sharon Hughes presented material that had been purged from Kearly's personnel file to Stamatakis about his past misconduct. In addition, Hughes emphatically voiced her concern to Stamatakis that Kearly was a threat to elementary school students.

Having received documents and other information regarding Kearly's persistent and recent pattern of sexual misconduct, Stamatakis still resolved the grievance in Kearly's favor and allowed him to teach elementary school students, citing insufficient evidence in Kearly's personnel file to strip him of his tenure. The record also reveals that in approving the transfer, Stamatakis evaded the normal chain of command in the School District, ignoring Roger Allen, then an Associate Superintendent of Human Resources, who would have argued against the transfer.

Most troubling, however, is Stamatakis's decision to permit Kearly's transfer partly because he thought that Kearly would be better behaved once removed from the middle school setting, where the girls were older and more physically developed. Yet Stamatakis acknowledged that, in general, younger girls are *more* vulnerable to sexual predators like Kearly.

Stamatakis now concedes that his illogical reasoning was negligent, or at worst, reckless. But he denies that it constituted deliberate indifference to the danger posed by Kearly. But by Stamatakis's own admission, his reasoning was not innocuously or even recklessly mistaken, it was knowingly baseless—that is, he conceded that younger girls would be more susceptible to Kearly's sexual assaults. This is a paradigmatic example of deliberate indifference.

There is ample proof in the record that Stamatakis, lacking sufficient documentary evidence in Kearly's personnel file to initiate tenure revocation proceedings—and wishing to avoid battling with the union—chose the path of deliberate indifference to the imminent danger he knew Kearly posed to students. Stamatakis's fear of a union battle is irrelevant: whether or not the personnel file would justify tenure revocation proceedings, Stamatakis knew more than was in the file. (And it is particularly irrelevant where the School District Stamatakis heads deliberately deprives itself of the means to preserve a record of sexual molesters in its employ by virtue of a file-purging policy). For the same reason, we are also unpersuaded by Stamatakis's contention—raised for the first time at oral argument—that his decision to transfer Kearly was not deliberately indifferent because legal counsel confirmed for him that tenure revocation proceedings would probably be unsuccessful. There is no evidence that counsel weighed the prospects for tenure revocation against the prospects for Kearly's future sexual abuse and violation of students' constitutional rights. And in any event, as we have just explained, those concerns are mutually exclusive.

Accordingly, we find that there is ample evidence in the record demonstrating Stamatakis's deliberate indifference to what he knew was the imminent danger posed by Kearly. We turn now to that part of the qualified immunity analysis which requires us to examine whether it was sufficiently clear that a reasonable official in Stamatakis's position would understand that what he was doing subjected him to supervisory liability pursuant to 42 U.S.C. § 1983. An examination of *Roseville* and *Doe v. Claiborne*, 103 F.3d 495 (6th Cir. 1996), is instructive because Stamatakis's actions differ from those of the school officials in those cases, who were ultimately granted qualified immunity.

In *Roseville,* the plaintiff alleged that she was sexually abused by John Lomnicki, her elementary school teacher. During the 1975–76 school year, several girls alleged that Lomnicki inappropriately touched them. Principal Slinde expressed her disbelief at the allegation and neither reported nor documented the incident. She did, however, issue Lomnicki an oral warning. *Roseville*, 296 F.3d at 433–34. The following year, more allegations of improper touching arose. Slinde allegedly questioned the girls and told them that "she did not want to hear anymore talk about it," and cautioned them not to tell anyone of the touching, even their parents. *Id.*

In 1979, after Lomnicki had been transferred to a different elementary school, Superintendent Mayer was notified that Lomnicki had fondled four sixth-grade girls. Mayer investigated, determined that Lomnicki had used "poor judgment," and issued a written but sealed reprimand. *Id.* at 435. Lomnicki was subsequently transferred to yet another elementary school. Upon his transfer, school officials were not informed about his past. No additional allegations of improper conduct were made until 1988 when several sixth-grade girls reported improper touching by Lomnicki. Assistant Superintendent Her-

ron conducted an investigation and another sealed reprimand was issued. Additionally, Superintendent Mayer sent a confidential memorandum to the board of education and the district attorney, informing them of the two incidents for which Lomnicki received written sealed reprimands. *Id.* Mayer also notified the County Child Abuse Office. He then transferred Lomnicki to the Eastland elementary school. It was there, in 1992 and 1993, that the plaintiff in *Roseville* alleged that Lomnicki committed horrific acts of sexual abuse. The plaintiff, however, did not immediately notify her parents or school authorities. Instead, in early 1993, a criminal investigation was commenced against Lomnicki with respect to an unrelated matter—the sexual abuse of his neighbor. Superintendent Kment was informed of the police investigation in January or February 1993. Lomnicki was removed from direct contact with students. In December 1994, the plaintiff's mother reported her daughter's allegations. Director of Special Education Silava immediately filed a report with the Michigan Department of Social Services. However, she stated that the perpetrator of the abuse was unknown but possibly in the household. The plaintiff's litigation ensued.

This Court first addressed the actions of Slinde, Mayer, and Herron, the three employees who were no longer employed by the district at the time the plaintiff was allegedly abused. The Court acknowledged that the conduct of the three defendants was "disturbing" but that their acts did not constitute participation in or knowing acquiescence to the abuse. The Court noted that Lomnicki's actions were sporadic—occurring in 1979 and 1988, nearly ten years apart—such that the school officials were not confronted with conduct that was "obvious flagrant, rampant, and of continued duration." *Id.* at 440–41. Similarly, the Court found that Superintendent

Kment did not violate the plaintiff's constitutional rights. It was undisputed that he was not aware of any of Lomnicki's history of misconduct with female students and that he possessed no knowledge about the plaintiff's abuse until the end of 1994.

The actions and inactions of the *Roseville* defendants are easily distinguishable from those of Stamatakis. First, as we have already discussed, Stamatakis had knowledge of Kearly's misconduct, which, unlike Lomnicki's, was repeated and recent, as opposed to sporadic. Moreover, Stamatakis's actions constituted "knowing acquiescence" to abuse. Stamatakis knew that Kearly posed a danger to young girls, but when faced with two poisons—a union battle or transferring Kearly—he chose to transfer Kearly to an elementary school, despite his understanding that younger girls are typically *more* susceptible to sexual predators.

In *Doe v. Claiborne County*, 103 F.3d 495 (6th Cir.1996), the plaintiff alleged that she was sexually harassed, abused, and raped by Jeffrey Davis, a physical education teacher at Midway School, in 1991 and 1992. Allegations about Davis first surfaced in 1989. At that time, Principal James Bundren was informed that Davis allegedly touched a female student in an inappropriate manner. A meeting was convened by Bundren with Davis, former Superintendent Peters, and the student's family. Davis contended that nothing inappropriate occurred, an explanation which apparently satisfied the student's mother. Bundren warned Davis "not to be so friendly with [the] students," and placed a note of the meeting in Davis's personnel file. *Id.* at 501–02.

Several months later, in January 1990, Superintendent Peters was notified by the Department of Human Services ("DHS")

that Davis had allegedly sexually abused nine different girls at Midway School. Two months later, the DHS informed Peters that Davis was still under investigation and that "immediate action" needed to be taken to ensure that Davis would have "no access to or contact with any child." The district promptly removed Davis from student contact and chose not to rehire him for the next school year. *Id.* at 502.

Thereafter, the DHS concluded that four of the nine allegations were "founded." Davis negotiated a "pre-trial agreement" with the DHS in which the DHS agreed (1) that criminal proceedings, if any, would be brought by the alleged victims and not by DHS; (2) the DHS would not place Davis's name on a registry; and (3) although the DHS would notify the board of education of its finding, it would not take an active role in seeking the suspension of his teaching license. Interim Superintendent Dobbs interpreted the letter "to be an exoneration of Davis." *Id.* at 502–03.

Thereafter, based on a promise made by school board chairman Burchette that the school board would approve Davis's rehiring, defendant Barnard, principal at Soldiers Memorial Middle School personally offered Davis the position of physical education teacher and coach at the school. When Davis started to explain the DHS charges, Barnard responded that he didn't "want to hear about it." Although Barnard knew that DHS had requested that Davis refrain from student contact, he made no further inquiries because he believed that Davis had been exonerated of all charges based on the pre-trial agreement. In September 1990, the school board officially rehired Davis. At the hearing, Superintendent Norris testified that he inspected Davis's personnel file and interpreted the information in it as consisting of "unfounded charges." *Id.* at 503.

Because of the DHS charges and other rumors and accusations. Principal Barnard began to supervise Davis closely. In fact, Barnard's permission was specifically requested with respect to the use of the plaintiff as a scorekeeper for Davis's basketball team. Barnard responded: "If you can't find anybody else. If we can't find anybody else." Davis began to sexually abuse the plaintiff shortly thereafter. *Id.* at 503.

The Sixth Circuit affirmed the district court's dismissal of the plaintiff's § 1983 claims against Superintendents Peters and Norris, and Principal Barnard, stating that the defendants may have been "sloppy, reckless, or neglectful in the performance of their duties" but that they were not confronted with "such a widespread pattern of constitutional violations that their actions or inactions amounted to a deliberate indifference to the danger of Davis sexually abusing students." *Id.* at 513.

■ Once again, these facts are unlike our case. Stamatakis was confronted with a widespread pattern of constitutional violations by Kearly. At high-level meetings, he had been shown records by Sharon Hughes that had been purged from Kearly's file. Also, Hughes separately sent Stamatakis documents pertaining to Kearly's pattern of abuse and warned Stamatakis that Kearly was unsuited to be around elementary school students. Furthermore, unlike Barnard and Norris in *Claiborne*, Stamatakis has never claimed that he disbelieved the charges against Kearly. To the contrary, Stamatakis acknowledged that Kearly behaved inappropriately around young girls and posed a danger the younger they were.

In these respects, Stamatakis's actions were objectively unreasonable and a reasonable official in his position would understand that his actions were unlawful. Therefore, we deny Stamatakis's claim for qualified immunity and affirm the district court's denial of his motion for summary judgment.

C. *Pendent Appellate Jurisdiction Over the School District's Appeal*

■ We decline to exercise pendent appellate jurisdiction over the School District's interlocutory appeal because it is not "inextricably intertwined" with the qualified immunity analysis above. *Mattox v. City of Forest Park,* 183 F.3d 515, 523–24 (6th Cir.1999). Accordingly, we dismiss the School District's appeal.

### III. CONCLUSION

For the foregoing reasons, we DISMISS Jerry Maiorano and Paul Clor's appeals for lack of appellate jurisdiction; we AFFIRM the district court's denial of qualified immunity and summary judgment as to Paul Stamatakis; and we DISMISS the School District's appeal for lack of jurisdiction because we decline to exercise pendent appellate jurisdiction over it.

Kennedy, Circuit Judge, concurring. I concur in the dismissal of the appeals of Warren Consolidated Schools, James Clor, and Jerry Maiorano for lack of jurisdiction.

However, I would dismiss Dr. Stamatakis' appeal for lack of jurisdiction as well. While Dr. Stamatakis has stated that he accepts the facts as set forth in the district court's opinion, nowhere does he specifically acknowledge what those facts are. The district court noted in its opinion (J.A. 36) that Dr. Stamatakis claims that, if all the information regarding Kearly's prior conduct had been maintained in Kearly's official personnel file, he may have made a different decision regarding the transfer. The district court further noted that Dr. Stamatakis' claim of ignorance as to what he had been told before the transfer is in direct conflict with the deposition testimony of Marsha Pando as to what Dr. Stamatakis had been told before the transfer. Dr. Stamatakis has not admitted that he did not provide Dr. Clor the information about Kearly's sexual practices, therefore leaving Dr. Clor in the dark as to why Kearly was to be closely monitored and, thus, preventing Dr. Clor from ensuring that Kearly not be left alone with plaintiffs.

The district court also noted that Dr. Stamatakis claims that he put Dr. Clor in charge of making sure that Kearly, after his transfer to an elementary school, would be closely supervised and directed to use student aides. Dr. Clor claims he did not know the reason for monitoring Kearly so he never alerted the principal to the problem. While Maiorano admitted that Kearly's file stated that he was not to have student aides, Maiorano denies he was told—and the file does not reveal—the reason for that restriction.

Further, although Dr. Stamatakis relies on the advice of counsel, nowhere in his brief or on the record does he set forth the information given to counsel. In Dr. Stamatakis' deposition (J.A. 472) he testified that, "based on what was in . . . [Kearly's] file, we [Dr. Stamatakis and counsel] made the decision on those items." Later, he testified that they made the decision based upon information that they had at the time. Counsel's opinion regarding whether the school district should have conceded Kearly's grievance over the transfer refus-

al was presented to Dr. Stamatakis orally; there was no written opinion. Dr. Stamatakis' testimony also mentions a discussion with counsel as to whether a tenure action would have been successful. (J.A. 463). Again, the record does not contain counsel's opinion. Indeed, Dr. Stamatakis and the school board claimed attorney-client privilege with respect to the opinion.

We have conflicting information as to what was in Kearly's file, what information was given to counsel, and what counsel advised.[1]

In view of all these unresolved factual issues, we do not have jurisdiction under *Jones* to determine whether Dr. Stamatakis was deliberately indifferent in permitting Kearly's transfer to an elementary-school setting.

Accordingly, I would dismiss the appeal for lack of jurisdiction.

---

1. Other than looking at his personnel file, what else did you do or have to do to determine what kind of teach Mr. Kearly was and whether or not he had a problem which would necessitate action being taken to not allow him to transfer to the elementary school?
   A. What I did?
   Q. Well, you, the district.
   A. Okay. I turned the file over to legal counsel and asked for their review of it.
   Q. Who?
   A. Gary Collins and John Nitz.

Q. Did you receive a written response?
A. No. We had discussions.
Q. And what was the content of those discussions, sir?
MR. HITCHCOCK: I'm—I'll object to him answering regarding conversations he had with the attorney or the attorney had with him.
MR. SEIKALY: On the grounds?
MR. HITCHCOCK: It's privileges, attorney-client privilege.
(J.A. 459)