**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 17a0357n.06

No. 16-6629

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ALAN JAMES HOWARD, SR. and VIRGINIA MARIE HOWARD, individually and as next friends of W.H., a minor child; ROBERT ROSASCO and KIMBERLY ROSASCO, individually and as next friends of L.R., a minor child, | ) ) ) ) ) ) ) | **FILED** Jun 21, 2017 DEBORAH S. HUNT, Clerk |
| **Plaintiffs-Appellees,** | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| KNOX COUNTY, TENNESSEE et al., | ) ) | |
| **Defendants,** | ) ) | **OPINION** |
| and | ) ) | |
| TIMOTHY WIEGENSTEIN, individually, | ) ) | |
| **Defendant-Appellant.** | ) ) ) | |

Before: BOGGS, MOORE, and McKEAGUE, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** From 2011 to 2014, Defendant Rebecca Shoemaker, a teacher's assistant at Halls Middle School ("Halls") in Knox County, Tennessee, physically, verbally, and emotionally abused special-needs students, including minor Plaintiffs W.H. and L.R. Despite numerous complaints from parents and students that Shoemaker had committed specific acts of abuse, Defendant Timothy Wiegenstein, the principal of Halls, failed to investigate or take any action to stop Shoemaker's abuse. Instead, with knowledge of the risk

that Shoemaker posed to special-needs children, Wiegenstein heightened the risk by placing her in a special-needs classroom as a teacher's assistant. In that role, Shoemaker committed numerous acts of abuse against the minor Plaintiffs, for which she was later indicted. Plaintiffs brought suit under 42 U.S.C. § 1983 against Knox County, the Knox County Board of Education ("KCBOE"), Wiegenstein, and Shoemaker, alleging violations of their rights under the Fourteenth Amendment. Wiegenstein filed a motion to dismiss claiming he was entitled to qualified immunity, which the district court denied. Wiegenstein now argues on appeal that Plaintiffs have failed to allege sufficient facts that demonstrate that he knew about the ongoing abuse and thus cannot establish that he acted with deliberate indifference.

For the following reasons, we **AFFIRM** the district court's order denying Wiegenstein's motion to dismiss Plaintiffs' 42 U.S.C. § 1983 claim on the basis of qualified immunity.

## I. BACKGROUND

Shoemaker began working at Halls during the 2011 to 2012 school year. During her first year, Shoemaker was assigned to be a direct assistant to L.R., which meant that she was "responsible for every need of L.R. while at Halls Middle School." R. 44 (Am. Compl. at ¶ 20–21) (Page ID #398). According to Plaintiffs, while Shoemaker was serving as L.R.'s direct assistant, her parents, Robert and Kimberly Rosasco, began to notice that L.R. was exhibiting "new outbursts and aggressive behavior." *Id.* at ¶ 21 (Page ID #398). Plaintiffs allege that the Rosascos made numerous complaints to the KCBOE, the administration, and the school's principal, Wiegenstein, and demanded that Shoemaker be replaced as L.R.'s direct assistant. *Id.* at ¶ 22 (Page ID #398–99). They further allege that, in response to these complaints, Defendants

2

failed to investigate or remove Shoemaker, and "school officials responded . . . by affirmatively telling [the Rosascos] that they could 'get worse.'" *Id.* The Rosascos later noticed bruising on L.R.'s knees and discovered that L.R. had been kept in a room alone for hours and was not permitted for a whole day to use the restroom. *Id.* at ¶ 23 (Page ID #399–400). After the Rosascos threatened legal action, Defendants agreed to replace Shoemaker as L.R.'s direct assistant. *Id.* According to Plaintiffs, Shoemaker was not investigated or trained after this reassignment. *Id.*

One year later, at the start of the 2013 to 2014 school year, Shoemaker was "promoted" to a teacher's assistant position. *Id.* Shoemaker had worked as a teacher's assistant once before at her prior job at Brickey Elementary School ("Brickey"), where she received negative performance evaluations. *Id.* at ¶ 19 (Page ID #397). An April 2011 performance evaluation reprimanded Shoemaker and stated that she "needed improvement" in "maintaining self-control in frustrating and difficult situations; following directions of supervisors; and, providing a positive rapport with the children, teachers and parents." *Id.* "Shoemaker also received an 'unsatisfactory' evaluation regarding her compliance with school and department regulations." *Id.* Brickey, like Halls, is overseen by the KCBOE, and Plaintiffs assert that "these deficient evaluation scores, as well as the grounds on which they were based, were either (a) already known by [KCBOE], and/or (b) placed in Defendant Shoemaker's personnel file" when she transferred to Halls. *Id.*

Despite these negative evaluations, Shoemaker was assigned to be a teacher's assistant in Halls's Comprehensive Developmental Classroom – Alternative Learning ("CDC-A")

classroom. *Id.* at ¶ 23 (Page ID #399). The CDC-A classroom was intended for special-needs students and was overseen by one special-education teacher and two teacher's assistants, including Shoemaker. *Id.* at ¶ 24 (Page ID #400). Shoemaker, who was assigned to a regular classroom at Brickey, had never worked as a teacher's assistant in a special-needs classroom before. *Id.* at ¶ 19 (Page ID #397). According to Plaintiffs, Shoemaker was not trained and lacked the knowledge necessary to handle a class of special-needs students. *Id.* at ¶ 23 (Page ID #399–400). Specifically, "Shoemaker did not have a four-year degree, a teacher's license, or sufficient relevant experience and training to give her the requisite knowledge, patience, skills and abilities to appropriately deal with special needs children." *Id.* at ¶ 18 (Page ID #396–97). According to Plaintiffs, this transfer was made despite Defendants' knowledge of Shoemaker's prior misconduct, not only with regard to L.R., but also with regard to her past performance at Brickey. *Id.* at ¶ 23 (Page ID #399–400).

W.H. and L.R. were both placed in the CDC-A classroom with Shoemaker for the 2013 to 2014 school year. *Id.* at ¶ 24 (Page ID #400). W.H., who was thirteen when the Amended Complaint was filed, is wheelchair-bound and has severe physical and mental disabilities that render her unable to speak. *Id.* at ¶ 14 (Page ID #394). She is classified by KCBOE as being intellectually disabled. *Id.* L.R. similarly has physical and mental disabilities. She is classified by KCBOE as being "intellectually disabled in certain areas of the educational spectrum, yet gifted in others." *Id.* at ¶ 15 (Page ID #394–95). Whereas W.H. was assigned to the CDC-A classroom full-time, L.R. was assigned there "as both a student for a portion of her learning and

as a peer mentor due to her qualities in the areas of which she was classified as gifted." *Id.* at ¶ 14–15 (Page ID #394–95). L.R. also attended some classes in regular classroom settings. *Id.*

Near the end of the 2013 to 2014 school year, the special-education teacher assigned to CDC-A, referred to by both parties as the "Teacher of the Year," announced her intent to resign at the end of the school year. *Id.* at ¶ 25 (Page ID #400–01). According to Plaintiffs, the Teacher of the Year was highly competent and well trained to care for special-needs children. *Id.* Prior to her resignation, the Teacher of the Year took part in two separate exit interviews, one conducted by Wiegenstein and the other by a supervisor in the KCBOE Special Education Department. *Id.* at ¶ 26 (Page ID #401–02). According to Plaintiffs, the Teacher of the Year expressed in both interviews that Halls did not provide adequate support to special-needs students and the CDC-A classroom. *Id.* She also expressed her "strong opinion" that Shoemaker should be removed immediately from the CDC-A classroom and replaced with "a properly trained individual." *Id.* Plaintiffs allege that "[t]he teacher specifically stated that the school could not have someone like Rebecca Shoemaker in a CDC-A classroom that treats special needs children the way she does." *Id.* She also asked Wiegenstein to "promise that the children would not be hurt." *Id.* According to Plaintiffs, Wiegenstein reassured her and promised that the children "would be looked after and protected." *Id.* Despite these conversations, Wiegenstein did not investigate Shoemaker or transfer her out of the CDC-A classroom. *Id.* During the 2014 to 2015 school year, Shoemaker was kept on as a teacher's assistant in the same classroom, and the Teacher of the Year was replaced by a first-year teacher. *Id.*

Plaintiffs argue that after the Teacher of the Year resigned, Wiegenstein continued to receive numerous complaints related to Shoemaker's physical abuse, but he did not investigate or report these concerns to the proper authorities. *Id.* During the 2014 to 2015 school year, several student-peer mentors assigned to the CDC-A classroom witnessed Shoemaker's abusive behavior toward the special-needs students and reported their concerns to school officials, including Wiegenstein. *Id.* at ¶ 27 (Page ID #402–03). The parents of some of these student-peer mentors also reported these claims of abuse. *Id.* at ¶ 28 (Page ID #403). Plaintiffs argue that Defendants failed to investigate, report, or respond to any of these allegations.

On one occasion, Virginia Howard, W.H.'s mother, witnessed Shoemaker "forcefully grab [W.H.'s] face and shake it while screaming at her." *Id.* at ¶ 30 (Page ID #404–05). Mrs. Howard "immediately informed" Wiegenstein of this incident. *Id.* The Howards also began to notice visible changes to W.H.'s behavior shortly after the start of the 2014 to 2015 school year. *Id.* Plaintiffs believe that W.H. was mimicking Shoemaker's abusive and angry behavior. *Id.* Plaintiffs argue that Defendants did not take any action in response to complaints from the Howards about this abuse. *Id.*

On September 24, 2014, the Knox County Sheriff's Department contacted the Howards to inform them that the police had received a credible complaint regarding Shoemaker's abuse of children in the CDC-A classroom, including W.H. *Id.* at ¶ 32 (Page ID #405–06). The police, along with the Tennessee Department of Children's Services, launched an investigation. *Id.* On September 30, 2014, "Shoemaker was forced to resign." *Id.* Plaintiffs state that Shoemaker was

arrested and indicted for assault and battery and that, although the investigation is "ongoing, . . .

an admission of guilt was obtained." *Id.* at ¶ 32, 36 (Page ID #405–06, 408).

With regard to the specific allegations of abuse against W.H. and L.R., Plaintiffs allege

that:

> Upon information and belief, these acts of physical and verbal abuse directly and specifically involving W.H. included, without limitation, the following: physically dragging children by their extremities in such a way that the children's heads and/or bodies would strike objects, walls, and/or the ground; violently throwing or pushing children into corners and/or walls; throwing or pushing helpless children into chairs and/or other objects; physically grabbing the children's fingers, wrists, and joints and threatening to bend or twist them with the intent of causing fear and anxiety; actually squeezing and bending the children's fingers, wrists, and joints so as to cause pain, break bones, and elicit screams of pain from the children; violently grabbing a child's hair and using it to jerk and shake the child's head with the intent to inflict serious abusive pain; violently, physically, and in a painfully forceful manner, grabbing a child's chin and shaking the child's head while screaming at the child; physically standing on a child's feet and toes and then stomping on them; bending a child's foot, feet, and/or ankles in a deliberate and violent manner to inflict extreme pain and elicit screams; physically slinging a child from a chair to the floor; loudly screaming into a child's ear, demanding that the children strike and hit each other; and physically and verbally abusing children in the course of walking to, using, and leaving the restroom so as to prevent them from using the restroom properly and to cause anxiety and fear about using the restroom.
>
> Upon information and belief, Defendant Shoemaker's physical and verbal abuse directly and specifically involving L.R. included, without limitation, the following: violent banging of L.R.'s head and arms against cinder block walls because [Shoemaker] hated to change [L.R.'s] clothes after urination; inhumanely placing L.R. in an approximately eight by eight (8 x 8) room with no windows (the equivalent of a jail-like cell) for hours to a full day with the inability to urinate based upon Defendant Shoemaker's heartless disgust with having to help the immobile L.R. urinate or change her clothing. Further, said inhumane physical and psychological abuse from Defendant Shoemaker caused the disabled L.R. to incur a significant amount of yeast and kidney infections due to Shoemaker's prohibition of L.R.'s ability to urinate, physical, psychological flashbacks, nightmares, uncontrolled seizure-like behavior, increased physical eruption of her behavior due to her condition regarding "tone effect" due to

7

> Defendant Shoemaker's abusive temper and yelling, and loss of sleep. Defendant Shoemaker's abuse not only caused heinously serious physical harm and inhumane humiliation, but also caused anxiety and fear about the consequences of not being able to use the restroom. The combined effects from the inhumane treatment and abuse, has caused L.R. to be prescribed medication related to these abusive sadistic behavior committed by Defendant Shoemaker, and L.R. will need to continue taking this medication for her future wellbeing.

*Id.* at ¶ 33–34 (Page ID #406–07).

Plaintiffs filed three separate lawsuits in state court, alleging claims under 42 U.S.C. § 1983 based on Shoemaker's abuse. Defendants timely removed two of these cases to the District Court for the Eastern District of Tennessee. R. 1 (Notice of Removal) (Page ID #1–3). The cases were consolidated, and an amended consolidated complaint was filed on September 8, 2015. R. 44 (Am. Compl.) (Page ID #391–423). In the amended complaint, Plaintiffs brought claims against Knox County, the KCBOE, and Wiegenstein, in his individual capacity, as well as Shoemaker, in her individual capacity, alleging that Defendants had violated the Fourteenth Amendment rights of the minor Plaintiffs. *Id.* at ¶ 54 (Page ID #415). Plaintiffs asserted that Wiegenstein knowingly authorized Shoemaker's abuse and that even though "Wiegenstein had direct knowledge of prior abuse allegations made by teachers, parents and students . . . [he] took no action except to continue Defendant Shoemaker's employment and promote her to a more volatile situation involving numerous special needs children, including the minor Plaintiffs." *Id.* at ¶ 56 (Page ID #415–16). Plaintiffs further alleged that Knox County and the KCBOE were liable for Shoemaker and Wiegenstein's actions because they had "proper notice and/or constructive notice of the unjustifiable and intolerable actions and/or omissions." *Id.* at ¶ 58

8

(Page ID #416). Plaintiffs also brought various state-law, negligence-per-se, and intentional-tort claims against Defendants. *Id.* at ¶ 62–72 (Page ID #417–21).

In response, Knox County, the KCBOE, and Wiegenstein each filed motions to dismiss. R. 50 (Knox Cty. Mot. to Dismiss) (Page ID #562–99); R. 46 (KCBOE Mot. to Dismiss) (Page ID #440–57); R. 48 (Wiegenstein Mot. to Dismiss) (Page ID #538–60). The KCBOE also filed a motion to strike assertedly immaterial and impertinent allegations, and Knox County, Wiegenstein, and Shoemaker jointly filed a motion to strike redundant parties. R. 46 (KCBOE Mot. to Dismiss) (Page ID #440–57); R. 59 (Defs. Mot. to Strike) (Page ID #729–32). The district court granted Knox County's motion to dismiss as to the negligence-per-se, common-law-negligence, and punitive-damages claims, but denied the motion as to Plaintiffs' § 1983 claim for municipal liability. R. 70 (Dist. Ct. Order at 2, 38) (Page ID #795, 831). The district court granted the KCBOE's motion to dismiss as to the negligence-per-se claim, but denied it as to all other claims and denied the KCBOE's motion to strike. *Id.* at 2, 19–20 (Page ID #795, 812–13). As to Wiegenstein's motion to dismiss, the district court held that Wiegenstein was not entitled to qualified immunity and denied his motion to dismiss Plaintiffs' § 1983 claim. *Id.* at 48 (Page ID #841). Finally, the district court denied Defendants' motion to strike redundant parties. *Id.* at 49 (Page ID #842). Wiegenstein then filed a timely notice of appeal. The only issue on appeal is whether Plaintiffs allege sufficient facts to demonstrate that Wiegenstein is not entitled to qualified immunity.

## II.  ANALYSIS

### A.  Standard of Review

"The district court's rejection of the state defendants' qualified immunity defense at the pleading stage, posing a question of law, is reviewed de novo."  *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011) (citation omitted).  We must take as true the non-conclusory allegations in the complaint, and determine if the complaint contains "sufficient factual matter" to support a claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim is facially plausible when a plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Coley v. Lucas Cty.*, 799 F.3d 530, 537 (6th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678).  The allegations must be more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, the allegations "must be enough to raise a right to relief above the speculative level."  *Id.*

### B.  Qualified Immunity

The doctrine of qualified immunity shields government officials from civil liability under 42 U.S.C. § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Once qualified immunity is raised, the plaintiff bears the burden of showing that the defendants are not entitled to qualified immunity.  *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013).  The Supreme Court has "repeatedly . . . stressed the importance of resolving

10

immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted).

We conduct a two-step analysis to determine whether qualified immunity applies. *Coley*, 799 F.3d at 537. First, "viewing the facts in the light most favorable to the plaintiff, we determine whether the allegations give rise to a constitutional violation." *Id.* (citation omitted). Second, we must "assess whether the right was clearly established at the time of the incident." *Id.* (citation omitted). Courts have discretion to decide which of the two steps to address first. *Pearson*, 555 U.S. at 236. The parties do not dispute that the right at issue here was clearly established. *See* Appellant's Br. at 19; *see also Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987) ("It is well established that persons have a fourteenth amendment liberty interest in freedom from bodily injury."). We must therefore assess whether the allegations sufficiently allege a claim that Wiegenstein caused the constitutional deprivation.

### 1. Deliberate Indifference

Plaintiffs argue that although Wiegenstein did not himself physically abuse the minor children, he is nonetheless liable as a supervisor for causing minor Plaintiffs W.H. and L.R. to be deprived of a federal right. Appellee's Br. at 14; *see also Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) ("[T]o establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." (citation omitted)). It is well-established that "a mere failure to act will not suffice to establish supervisory liability," and that a showing of "active unconstitutional behavior" is required. *Peatross*, 818 F.3d at 241 (citation omitted). "However, 'active' behavior does not mean 'active'

11

in the sense that the supervisor must have physically put his hands on the injured party or even physically been present at the time of the constitutional violation." *Id.* at 242 (citation omitted). In order to bring a claim of supervisory liability against a school official, a plaintiff must show that the defendant's "failure to take adequate precautions amounted to deliberate indifference to the constitutional rights of students." *Doe v. Warren Consol. Schs.*, 93 F. App'x 812, 818–19 (6th Cir. 2004) (citation omitted). This requires, at a minimum, a showing "that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Doe v. Claiborne Cty.*, 103 F.3d 495, 511 (6th Cir. 1996) (citation omitted).

The issue of deliberate indifference in this context is a question of proportionality. *McCoy v. Bd. of Ed., Columbus City Schs.*, 515 F. App'x 387, 391 (6th Cir. 2013). The court should first take into consideration the information available to the supervisor at the time, and whether the information available to the supervisor "showed a strong likelihood" that the defendant would engage in similar behavior in the future. *Claiborne Cty.*, 103 F.3d at 513 (citation omitted). The likelihood of future harm may depend upon a showing that the supervisor "was confronted with a widespread pattern of constitutional violations," not merely isolated or "sporadic" incidents. *Warren*, 93 F. App'x at 821–22. Next, the court must consider whether, in light of that information, the school official's response rises to the level of deliberate indifference. *Id.* at 821.

Taking as true the allegations contained in the amended complaint, we conclude that Plaintiffs have alleged sufficient facts to demonstrate that Wiegenstein had actual knowledge of

Shoemaker's abuse. Plaintiffs point to numerous examples where parents and students complained to Wiegenstein about *specific* incidents of abuse witnessed or otherwise discovered, not just a general fear of potential abuse. The complaint clearly states that during the 2011 to 2012 school year, the Rosascos made repeated complaints to Wiegenstein "including claims of verbal and physical abuse . . . by Defendant Shoemaker" after they began to notice aggressive behavior in their daughter. R. 44 (Am. Compl. at ¶ 22) (Page ID #398). Moreover, the Rosascos allege that they threatened legal action after they discovered bruising on L.R.'s knees and learned that, when Shoemaker was assigned as L.R.'s direct assistant, she kept L.R. isolated in a room alone and did not allow her to use the restroom for an entire day. *Id.* at ¶ 23 (Page ID #399–400). These complaints clearly put Wiegenstein on notice that a constitutional deprivation was taking place as to L.R.

Wiegenstein was also put on notice of the abuse of W.H. when Mrs. Howard personally witnessed Shoemaker grab and shake W.H.'s face[1] and "immediately informed Defendant

---

[1]In a letter submitted to this court after oral argument, Wiegenstein argues that our recent holding in *Gohl v. Livonia Public Schools School District*, 836 F.3d 672, 678 (6th Cir. 2016), *petition for cert. filed*, (U.S. Feb. 16, 2017) (No. 16–1001), establishes that this type of behavior does not shock the conscience absent a serious injury. We note, first, that the shocks-the-conscience standard is wholly distinct from the question of whether, in light of the information Wiegenstein possessed at the time, Shoemaker "'showed a strong likelihood that he would attempt to' [harm] other students, such that the 'failure to take adequate precautions amounted to deliberate indifference' to the constitutional rights of students." *Claiborne Cty.*, 103 F.3d at 513 (citation omitted). The parties do not dispute that Shoemaker's individual actions shocked the conscience. Moreover, contrary to Wiegenstein's assertion, *Gohl* did not go so far. There we held that a public school teacher's act of grabbing and squeezing a student's face may not necessarily shock the conscience if it is established that: 1) there was a pedagogical purpose for the use of force; 2) the force was proportionate to meet the legitimate objective; 3) the force was "applied in a good-faith effort to maintain or restore discipline [rather than] maliciously and

Wiegenstein of Defendant Shoemaker's continued and unjustified mistreatment and abuse of these children." *Id.* at ¶ 30 (Page ID #404–05). Wiegenstein was again put on notice during the 2014 to 2015 school year, when student-peer mentors and their parents allegedly "inform[ed] school officials, including Defendant Wiegenstein, of . . . problems associated with Defendant Shoemaker's mistreatment and/or abuse of the special needs children including, specifically, the minor Plaintiffs," which the student-peer mentors personally witnessed while mentoring students in the CDC-A classroom. *Id.* at ¶ 27–28 (Page ID #402–03). Plaintiffs have clearly alleged sufficient facts to demonstrate that Wiegenstein had actual knowledge of specific instances of Shoemaker's abuse. Wiegenstein also possessed information that showed it was highly likely that there was a "widespread pattern of constitutional violations," *Claiborne Cty.*, 103 F.3d at 513, not merely a few isolated incidents. The Teacher of the Year warned Wiegenstein that Shoemaker should not be placed in the CDC-A classroom and that the school could not have someone like her who "treats special needs children the way she does." R. 44 (Am. Compl. at ¶ 26) (Page ID #401–02). Wiegenstein also had access to Shoemaker's performance evaluations from Brickey, which indicated that she had trouble "maintaining self-control in frustrating and difficult situations" and in complying with school and department regulations. *Id.* at ¶ 19 (Page ID #397). Taken together, the information available to Wiegenstein demonstrated that Shoemaker had a pattern of abuse toward special-needs students and that there was a strong

---

sadistically;" and 4) there was no serious injury. *Gohl*, 836 F.3d at 678–79. There is nothing in the complaint to suggest that the actions here were so justified, whereas there are allegations that suggest Shoemaker's behavior was carried out maliciously and for no legitimate purpose and that Plaintiffs W.H. and L.R. suffered serious and long-term injuries as a result.

likelihood that Shoemaker would continue to harm special-needs students like W.H. and L.R. *See Claiborne Cty.*, 103 F.3d at 513.

We must next consider whether, given Wiegenstein's actual knowledge of Shoemaker's abuse, his response rises to the level of deliberate indifference. On the basis of the complaint, it is clear that his actions, and more often, inaction, constituted deliberate indifference. Although knowing acquiescence implies more than "sloppy, reckless, or neglectful" execution of duties, *Claiborne Cty.*, 103 F.3d at 513, "failure to take *any* disciplinary action despite reports of repeated [abuse] rises to the level of deliberate indifference," *McCoy*, 515 F. App'x at 391; *see also Peatross*, 818 F.3d at 243 (holding that plaintiffs raised a claim of deliberate indifference where the complaint alleged that defendant, despite acknowledging a problem with police operations, nonetheless failed to investigate allegations of excessive force and attempted to cover-up incidents by exonerating officers); *Davis v. Monroe Cty. Bd. of Ed.*, 526 U.S. 629, 654 (1999) (holding that a complaint alleging that a school board "made no effort whatsoever either to investigate or to put an end" to sexual harassment by a classmate "suggests that petitioner may be able to show . . . deliberate indifference on the part of the Board"). Moreover, a defendant may be more likely to be considered deliberately indifferent if he took affirmative action that heightened the risk of harm to the plaintiff. *See Warren*, 93 F. App'x at 819 (holding that qualified immunity did not apply where defendant had actual knowledge of a teacher's sexual-abuse history but chose to approve his transfer to an elementary school where plaintiff was abused).

The complaint alleges that Wiegenstein made no efforts to investigate, report, train, or terminate Shoemaker upon receipt of numerous complaints from students, parents, and teachers. R. 44 (Am. Compl. at ¶¶ 22–23, 26–31) (Page ID #398–405). This alone is sufficient to establish a claim for deliberate indifference. The complaint also alleges that Wiegenstein, despite knowledge of Shoemaker's abuse, took affirmative actions to heighten the risk of future harm to children. After receiving complaints from the Rosascos of verbal and physical abuse of their child and of specific discoveries including bruising on L.R.'s knees, Wiegenstein replaced Shoemaker as L.R.'s direct assistant. *Id.* at ¶ 23 (Page ID #399–400). However, Wiegenstein later placed Shoemaker in the CDC-A classroom, where L.R. was placed, along with numerous other special-needs children. *Id.* Given his earlier acknowledgement that Shoemaker was ill-suited to care for L.R. as a direct assistant, Wiegenstein's decision to place her *in L.R.'s classroom* with numerous other special-needs children goes beyond negligence, or even recklessness. Faced with knowledge of Shoemaker's history with L.R., Wiegenstein "chose the path of deliberate indifference to the imminent danger he knew [Shoemaker] posed to students." *Warren*, 93 F. App'x at 820.

Wiegenstein has failed to identify a single case where we held that a school supervisor who took no action in response to complaints of a constitutional violation was entitled to qualified immunity. In *Claiborne County*, we explicitly held that three supervisor-defendants carried out their statutory duty to supervise and report acts of misconduct, including by reporting allegations of sexual abuse to the appropriate child-welfare agency, removing the accused teacher from student contact during the pendency of the investigation, supervising later contact

with students, and determining that the teacher in question had been "exonerated" of all previous charges. *Claiborne Cty.*, 103 F.3d at 513. In *Doe v. City of Roseville*, we found that one of the supervisors filed a report with the child-welfare agency and believed that the abuse might be occurring at home, whereas the other supervisor did not become aware of a teacher's history of sexual misconduct until after the police launched an investigation. *Roseville*, 296 F.3d 431, 441 (6th Cir. 2002). The response of these officials is clearly distinguishable from that of Wiegenstein, who took no action despite numerous consistent complaints from students, parents, and teachers.

### 2. Causal Connection

Wiegenstein also contends that the claims against him should be dismissed because he believes that there is no causal connection between his failure to train and supervise and Shoemaker's criminal activity.[2] Appellant's Br. at 33. This is clearly incorrect. The complaint states that Wiegenstein was "in a position of supervision and control over teacher's assistan[ts] at Halls Middle School, including Defendant Shoemaker." R. 44 (Am. Compl. at ¶¶ 10) (Page ID #393). By failing adequately to supervise and, in particular, to investigate allegations of abuse against Shoemaker and by placing Shoemaker in a situation that heightened the likelihood that

---

[2]We have not yet determined whether a causal connection must be shown where the plaintiff can establish active participation. *See Roseville*, 296 F.3d at 440 (acknowledging, without adopting, an Eleventh Circuit test that "[s]upervisor liability [under § 1983] occurs *either* when the supervisor personally participates in the alleged constitutional violation *or* when there is a causal connection," and noting that this is an "even stronger statement[] with regard to supervisory liability" as compared with the standard in our circuit (emphasis added) (first two alterations in original)). The language of § 1983 itself holds liable any person acting under color of law who "subjects, *or causes* [a person] to be subjected" to a constitutional violation. 42 U.S.C. § 1983 (emphasis added).

Shoemaker's widespread pattern of abuse would continue, Wiegenstein made it possible for Shoemaker continually to abuse the minor Plaintiffs.

## III. CONCLUSION

Based on the foregoing, we **AFFIRM** the district court's order denying Wiegenstein's motion to dismiss Plaintiffs' 42 U.S.C. § 1983 claim on the basis of qualified immunity.