RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0283p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JENNIFER GARZA, individually and as guardian ad litem for C.G. on behalf of C.G.,

*Plaintiff-Appellant*,

*v.*

No. 19-1645

LANSING SCHOOL DISTRICT; CONNIE NICKSON; TRACEY KEATON; MARTIN ALWARDT; YVONNE CAAMAL CANUL; SHERYL BACON; EDNA ROBINSON,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:15-cv-01128—Gordon J. Quist, District Judge.

Argued: March 13, 2020

Decided and Filed: August 28, 2020

Before: BOGGS, CLAY, and GIBBONS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Todd Boley, LAW OFFICE OF TODD BOLEY, Alameda, California, for Appellant. Scott L. Mandel, FOSTER SWIFT COLLINS & SMITH, PC, Lansing, Michigan, for Appellees. **ON BRIEF:** Beth M. Rivers, Megan A. Bonanni, Channing E. Robinson-Holmes, PITT MCGEHEE PALMER & RIVERS, P.C., Royal Oak, Michigan, for Appellant. Scott L. Mandel, Pamela C. Dausman, FOSTER SWIFT COLLINS & SMITH, PC, Lansing, Michigan, for Appellees.

CLAY, J., delivered the opinion of the court in which GIBBONS, J., joined, and BOGGS, J., joined in part. BOGGS, J. (pp. 34–35), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

CLAY, Circuit Judge. Plaintiff Jennifer Garza, acting individually and on behalf of her child, C.G., appeals the district court's judgment in this 42 U.S.C. § 1983 action against Defendants Lansing School District (the "District") and its current or former employees Sheryl Bacon, Edna Robinson, Martin Alwardt, Yvonne Caamal Canul, and Connie Nickson. This case arises out of former teacher Lester Duvall's physical abuse of C.G. Plaintiff alleges that the individual Defendants bear supervisory liability for Duvall's abuse because they were deliberately indifferent to the possibility that Duvall, who had a long history of abusing students, would also abuse C.G. The district court dismissed Plaintiff's claims against Defendants Bacon and Robinson, granted summary judgment to Defendants Alwardt, Caamal Canul, and Nickson, and denied Plaintiff's motion to amend her complaint to add an additional claim against the District. Plaintiff appeals each of these decisions.

For the reasons set forth in this opinion, we **REVERSE** the district court's dismissal of Plaintiff's claims against Defendants Bacon and Robinson and its grant of summary judgment to Defendants Alwardt, Caamal Canul, and Nickson, **AFFIRM** its denial of Plaintiff's motion to amend her pleadings, and **REMAND** for further proceedings consistent with this opinion.

**BACKGROUND**

In fall 2014, C.G. was a student at Gardner Leadership, Law, and Government Academy ("Gardner"), a school within the Lansing School District. C.G. has autism spectrum disorder and attention deficit disorder, and thus participated in the school's special education program, in which Lester Duvall taught. On October 7, 2014, Duvall allegedly abused C.G. by throwing him into furniture and kicking him in response to minor misbehavior. Because Plaintiff alleges that Defendants could have anticipated this incident based on Duvall's prior abuse of students, we begin with an overview of Duvall's history.

## A.  Duvall's History of Misconduct

Throughout Lester Duvall's time teaching in the District, District employees and community members repeatedly reported that Duvall had physically abused students.  Employees were trained to report serious teacher misconduct to the District Human Resources Department ("HR") or to their immediate supervisor, who would in turn report it to HR.  When employees suspected child abuse, they were also required to file a report with Child Protective Services ("CPS") and notify the student's parents.  Upon receiving a report, HR's responsibility was to investigate and determine what response was appropriate.

Duvall's first incidents of abuse reflected in the record took place in November 2003, when he was working at the Beekman Center ("Beekman"), a District school for students with special needs.  Defendant Sheryl Bacon was principal of Beekman at that time.  That month, an intern reported to her that Duvall had "slammed" a student into a table.  (Pl. Ex. 1, R. 112-2 at PageID #2546.)  A few days later, an aide in Duvall's classroom reported that Duvall had "[y]anked" a child from a chair by the arm, "slammed" another child into a table, and forcefully grabbed and squeezed another's face.  (*Id.* at #2541.)  The aide expressed concern that Duvall would eventually seriously hurt a student.  The record does not reflect if or how Bacon responded to these reports.

In April 2005, multiple teachers reported seeing Duvall slap a student across the face. This incident was also reported to Bacon, who told a teacher that the child's parents would be informed and an incident report created.  The record also does not reflect if or how Bacon actually responded to this incident.

In March 2007, an aide reported that Duvall pushed a student to the floor, grabbed him by the mouth and yelled at him in order to force him to spit out a piece of candy.  The child screamed and cried, and he was left with bloody scratches on his face.  Again, the record does not reflect if or how Bacon responded to this incident.

In mid-2011, Bacon retired, and Defendant Edna Robinson became principal of Beekman.  Bacon told Robinson prior to her start that Duvall was "a very good teacher," about whom she had received no complaints.  (Robinson Dep., R. 112-32 at PageID #3248.)  She also

said that she shredded her notes on anyone in the building prior to her departure.[1] Upon Robinson's arrival, the school's union representative presented her with a full envelope of statements regarding Duvall's mistreatment of students and women in the building. When deposed, Robinson explained that she spoke with staff about the allegations, and some corroborated them, while others did not. She said that she did not have enough evidence to be sure the incidents had occurred, but sent the statements to HR anyway.[2] The record does not reflect whether Robinson notified CPS or any students' parents about these incidents or whether HR undertook any additional investigation.

In April 2012, another Beekman special education teacher, Rezan Ellenwood, wrote to Robinson reporting multiple instances of abuse by Duvall and alleging that he had harassed her. Ellenwood stated that Duvall generally physically intimidated students and was excessively physically rough with them. More specifically, Ellenwood reported seeing Duvall "place his thumb under [a student's] jaw line and apply pressure to get her to stop [making] noises." (Pl. Ex. 2., R. 112-3 at PageID #2565.) She also saw Duvall "grab" a student by the shirt, "push him into the wall" and get up "nose to nose" with him. (*Id.*) Ellenwood explained that she had previously reported Duvall's physical aggression toward students to Defendant Bacon, who had not addressed her report.

After speaking with both Ellenwood and Duvall, Robinson referred the complaint to HR and requested an investigation by the District's Director of Public Safety, John Parks. Parks later noted that Robinson said this was the first complaint she had heard about Duvall. The record does not reflect whether Robinson also reported these allegations to CPS or any student parents. Robinson also contacted her supervisor, Defendant Martin Alwardt, the District's Director of Special Education, and told him that an investigation was pending.[3] Defendant Yvonne Caamal

---

[1]Because Bacon shredded her notes, the record does not reflect any additional incidents of abuse that might have been documented in them.

[2]It is not clear if these statements are included in the record. Plaintiff submitted a Freedom of Information Act ("FOIA") request for all documented allegations of abuse by Duvall, but the only earlier reports apparently secured were the November 2003, April 2005, and March 2007 complaints previously discussed. These may be the same statements provided to Robinson in this envelope, or there may be other statements not reflected in the record.

[3]When deposed, Alwardt said that he first saw Ellenwood's reports about Duvall years later, in a meeting with Ellenwood and other District administrators. It is not clear what information Robinson reported to Alwardt at

Canul, who was the District Superintendent beginning in 2012, likewise received a copy of Ellenwood's statement and passed it on to Alwardt for follow-up.

Parks investigated Ellenwood's allegations that Duvall had harassed her. Regarding her student abuse allegations, Parks later explained that he asked Duvall if he was abusing students and that Duvall said no, but that he did not look any further into the incidents Ellenwood alleged because he had no other evidence of them. Although Robinson claims to have sent the previously mentioned envelope of reports against Duvall to HR, Parks said that his office had never received any other reports about Duvall from any source. Parks' investigative report acknowledged Ellenwood's abuse allegations and that, when interviewed, she said that she had "constantly" reported incidents of abuse to Defendant Bacon, who "refused to do anything about [them]." (*Id.* at #2557.) The report did not include any other information on the reported abuse. Parks gave the report to HR, and later explained that Alwardt was then responsible for reviewing and evaluating the report and recommending follow-up as appropriate.[4] HR informed Robinson of the results of the investigation and that HR would respond to it. No other action was taken.

In October 2012, Ellenwood wrote to Parks, copying Alwardt. She expressed concern that her abuse allegations had not been investigated and requested that the investigation be reopened so that "[her] main, and most significant point (that Mr. Duvall physically mishandled students at the Beekman Center)" could be addressed. (Pl. Ex. 3, R. 112-4 at PageID #2597.) The record does not reflect any response to this follow-up complaint.

Later in October 2012, another Beekman aide, Emily Dove, requested to be removed from Duvall's classroom after working there for only four days because she was so disturbed by the abuse she had witnessed in that time. She detailed three incidents. First, when a student spilled juice, Duvall angrily threw the juice carton at the student. The next day, Duvall "grabbed" a student by the arm, "YANKED him up," and "yell[ed] at his face to stop making

---

[4]this point, but viewing the evidence in the light most favorable to Plaintiff and making reasonable inferences in Plaintiff's favor—as we must at this juncture—we assume that he heard about Ellenwood's allegations of physical abuse because Robinson says that she told him about the complaint.

[4]Alwardt asserts that he never received a copy of any investigative report completed by Parks. Again, viewing the evidence in the light most favorable to Plaintiff and making reasonable inferences in her favor, we infer that he did receive a copy of these reports as alleged and as Parks' deposition suggests.

noise." (Pl. Ex. 4, R. 112-5 at PageID #2637.) The student tried to sit down, but Duvall "yanked again at his arm" and when the student made more noise, Duvall "push[ed] the student and yell[ed] at him to stop." (*Id.*) Two days later, on October 4, 2012, a student got up from her chair after being told not to, whereupon Duvall started "yelling very rough," and "pushing, shoving, yanking to get the student back to her seat." (*Id.*) "[W]hen he got her in her seat[,] he placed his left hand on her [forehead] and pushed back and placed his right hand at her neck" and "push[ed] so hard that you could see the muscles in his arm tighten" for about fifteen seconds, "[t]he entire time while yelling at her to stay sitting and not to get up." (*Id.*) The student did not resist or fight back and "appeared to be in physical distress, because her eyes were bulging out of her face." (*Id.* at #2604.) This student was nonverbal.

Robinson submitted a report on Dove's statements to Parks, requesting another formal investigation, and further reported the incident to CPS. She also informed HR and Alwardt, who also referred the incident to Parks and HR. She then spoke with Duvall, who said that Dove had lied, but admitted using a pressure hold on a student. Robinson told him not to use force with students and reminded him that they had already spoken about his "inappropriate hands on techniques with students." (*Id.* at #2613.) Duvall responded that other Beekman administrators had allowed him to "handle students with behaviors" and that "he was not going to stop what he was doing." (*Id.*) Robinson later relayed a summary of this conversation to Parks and Alwardt.

Duvall was placed on paid administrative leave while the October 4, 2012 incident was investigated. This time, Parks' investigative report concluded that Duvall's actions were "punitive and in violation of [District policy on] discipline and use of physical force upon students."[5] (*Id.* at #2609.)

---

[5]That district policy established:

A. Physical restraint is appropriate only when a student is displaying physical behavior that presents substantial imminent risk of injury to the student or others.

  1. The student is demonstrating the intent and the ability to cause injury within a matter of minutes.

B. Physical restraint should only be employed as a last resort after other methods of de-escalating a dangerous situation have been attempted without success.

C. Physical restraint should only be employed by staff members who have received specific district approved crisis intervention training in the use of physical restraint procedures.

Parks' report also indicated that he had uncovered additional allegations against Duvall, which should be addressed "due to liability concerns." (*Id.*) To start, staff reported that Duvall had "a habit of refusing students' request to use the bathroom," leading in at least one instance to a student having a bowel movement in his clothes. (*Id.* at ##2651–52.) Parks next uncovered an email to Robinson from October 8, 2012, in which an employee of the Community Mental Health Authority ("CMH") reported the following incidents. First, in a 2010 meeting, Duvall told CMH that if a student became "too loud" while in the pool, "he dunks her head under water ([because] she hates the water)." (*Id.* at #2654.) In March 2011, a student returned from school with bruises and scratches, which she said were inflicted by Duvall. In April 2011, another student said that a "Ms. Reno" had touched her breasts and private areas, later identifying "Ms. Reno" as Duvall. (*Id.*) In May 2011, another student came home with an abrasion on their cheek, saying Duvall did it. Parks also attached a follow-up letter from October 10, 2012, in which CMH requested that a student not be placed in Duvall's classroom based on his repeated use of "physical force, control tactics and verbal threats" and indicated that numerous instances of Duvall's suspected abuse had been brought to the attention of protective services, Bacon and Robinson, and the Lansing Police Department. Parks did not receive authorization to investigate these allegations.

Upon receiving CMH's complaints, Robinson met with Duvall and passed them along to Defendant Alwardt. On October 12, 2012, an employee from Mid-Michigan Guardianship Services wrote to Robinson, copying Alwardt and Caamal Canul, to express support for CMH's concerns. The employee requested that a student not be placed in Duvall's classroom, a request

---

    1. Other school personnel may employ physical restraint procedures only in rare and clearly unavoidable emergency circumstances when fully trained school personnel are not immediately available. Untrained staff should request assistance from trained staff as soon as possible.

    2. A physical restraint of a student should be conducted in a manner consistent with the techniques prescribed in the District approved crisis intervention training program. . . .

H. For students with disabilities, the use of physical restraint *should not be included* in a student's IEP, or Behavior Intervention Plan. . . .

E. Restraint should never be used as a punishment, or to force compliance with staff commands.

(Pl. Ex. 5, R. 112-6 at PageID ##2661–62.) Duvall had not received training on how to use restraints. There were six exceptions to this policy, none of which applied in this incident.

Alwardt later confirmed that multiple parents and court-appointed guardians had also made.  On October 16, 2012, Alwardt received another letter from CMH requesting additional investigation into Duvall's conduct.  CMH noted that the non-verbal student who Duvall had choked had previously been removed from his classroom based on allegations of abuse that had been reported to protective services, the police, and Bacon.  CMH further noted that it had not received word about the October 4 incident, nor had the incident been reported to protective services or the student's guardian, as required by law.  In the same letter, CMH reported that a student had recently returned from Beekman with bruises on his neck, that Beekman had not responded to his guardian's request for information about the bruises, and that Robinson had not reported the bruises to CPS.

When deposed, Alwardt explained that he referred CMH's complaints to HR.  He said that he met with CMH representatives and looked for documentation on the allegations, but did not find any.  The record does not reflect whether any additional investigation took place.

Following the October incidents, Alwardt said in his deposition, he recommended that Duvall be suspended and required to take anger management training.  Initially, Duvall was suspended for three days without pay.  The District later reduced this suspension from three days to one day, with an agreement that if Duvall was not disciplined for similar conduct before the end of the 2013–2014 school year, it would be further reduced to "a formal counseling statement."  (Pl. Ex. 7, R. 112-8 at PageID #2672.)  When deposed, Duvall said that the suspension had ultimately been reduced to a letter of reprimand.  Alwardt said in his deposition that he also told Duvall that this conduct would not be tolerated, reminded him of the District's restraint policies, and ordered him to take additional Crisis Prevention Intervention training.  Duvall himself said that Alwardt never discussed any complaints with him prior to the incident with C.G., but instead actually chastised him twice while he was at Gardner for failing to use physical restraints.

At some point during her tenure at Beekman, Robinson spoke with Alwardt about a separate report from a parent whose child had bruising apparently inflicted by Duvall.  Upon receiving the parent's complaint, Robinson conducted her own building-level investigation, and met with Duvall, the parent, and the student.  Robinson's investigation was "inconclusive," and

she did not send her internal report about this incident to anyone. (Robinson Dep., R. 112-32 at PageID #3246.) She, like Bacon, shredded her notes upon her later retirement.

Following the "firestorm" of complaints CMH made about Duvall, Alwardt transferred Duvall from Beekman to Gardner beginning in the 2013–2014 school year. (Alwardt Dep., R. 112-24 at PageID ##2896–98.) Before Duvall started at Gardner, Alwardt reached out to Defendant Connie Nickson, who was the principal at Gardner. Alwardt says he told Nickson that Duvall had been accused of physical abuse, but that the District "had no documentation, no witnesses, no statements, nothing in the HR file" to support these allegations, and that "[e]verybody else says he's a good teacher." (*Id.* at #2890.) Nickson did not ask for details about those incidents.

Duvall's abuse continued at Gardner. In February 2014, Duvall's assistant reported that when a student became unruly, Duvall grabbed her by the arms and threw her ten feet across the room into the corner of a bookcase, leaving her with large bruises on her arms. (Pl. Ex. 12, R. 112-13 at PageID #2719.) The assistant stated that Duvall had thrown this student several times previously, was violent with other students, "brag[ged] about the mishandling" of a student, and generally "ha[d] an anger issue." (*Id.*) A student witness also stated that Duvall had thrown the student to the floor "[a] lot of times," and that Duvall had also thrown him to the floor before. (*Id.*) Nickson informed HR about this incident. A District employee investigated and concluded that although two witnesses agreed that Duvall had thrown the student, and although there were indeed bruises on the student's arms, because it was "not known whether [the student] clearly understands the difference between being legitimately restrained and 'thrown,'" the investigation was "inconclusive." (*Id.* at ##2722–23.) When deposed, Alwardt stated that in response to this incident, he recommended that HR monitor Duvall closely, but he could not confirm whether it did. Nickson did not take further action, later explaining that because "HR cleared him to continue to work, I assumed that he was okay to work." (Nickson Dep., R. 112-30 at PageID #3179.)

In May 2014, a student was pulled from Duvall's classroom because her mother perceived it to be an unsafe environment. That same month, Nickson evaluated Duvall's

performance for the year.   She gave him a perfect score in classroom management and recommended that his employment be continued.

In August 2014, Ellenwood again renewed her complaints about Duvall's conduct to District administrators.  In a meeting with Defendant Alwardt and other District executives, she provided them with a timeline of the incidents she witnessed, her reports, and the actions—or lack thereof—taken by the District.

## B.  Duvall's Abuse of C.G.

This brings us, finally, to Duvall's abuse of C.G.  On October 7, 2014, while in class with Duvall, C.G. asked to sharpen his pencil.  Duvall said no, but C.G. proceeded to sharpen his pencil anyway.  C.G. explained afterwards that Duvall then "grabbed my arm and threw me down on the floor." (C.G. Dep., R. 112-26 at PageID #3023.)  Duvall next "threw [C.G.] across the room." (*Id.*)  C.G. hit a bookshelf, the bottom part of which broke upon impact.  His head hit a trash can, which dented.  At some point during this encounter, C.G. kicked at Duvall, crying out "Leave me alone," and "Get away from me." (Pl. Ex. 17, R. 112-18 at PageID #2793; C.G. Dep., R. 112-26 at PageID ##3023–24.)[6]  C.G. suggests that Duvall kicked him back.  Duvall later stated that he "'pushed' [C.G.] to the floor" to prevent him from "run[ning] around the classroom and using a pencil in a threatening manner." (Pl. Ex. 17, R. 112-18 at PageID #2796.)

Following the incident, administrators asked Duvall to leave the building, contacted C.G.'s parents and HR, and placed Duvall on administrative leave.  Upon investigation, District employees concluded that Duvall had thrown C.G. into a bookcase, leaving him with "extreme bruising" in multiple places. (*Id.* at #2804.)  The investigation found no evidence to suggest C.G. required a physical intervention and that, even if he had, Duvall's conduct did not reflect a permissible intervention under any circumstances.  The District reported the incident to the Lansing Police Department, which did its own investigation and charged Duvall with fourth

---

[6]Defendants' account of the incident, drawn from what C.G. allegedly told the school social worker, suggests that Duvall only threw C.G. to the ground once and does not mention him hitting either the bookcase or the trash can.  Once again, we view the facts in the light most favorable to Plaintiff, which is corroborated by witness accounts.

degree child abuse.  Duvall did not return to teaching and later resigned pursuant to an agreement with the District.

On November 2, 2015, Plaintiff filed her complaint with the district court.  Plaintiff asserted, among other things, that Defendants Bacon, Robinson, Alwardt, Caamal Canul, and Nickson bore supervisory liability for Duvall's violation of C.G.'s right to bodily integrity under the Due Process Clause.  The district court dismissed Plaintiff's claims against Bacon and Robinson in June 2016.  In June 2017, Plaintiff filed a motion to amend the pleadings to add a claim against the District pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978).  The district court denied this motion and subsequently granted summary judgment to Alwardt, Caamal Canul, and Nickson.

This timely appeal followed.

**DISCUSSION**

**I.  Supervisory Liability Claims**

On appeal, the parties do not dispute that Duvall's conduct violated C.G.'s rights under the Due Process Clause of the Fourteenth Amendment.  Instead, they disagree as to whether the individual Defendants can be held liable for that violation as supervisors.

In order to succeed on a supervisory liability claim, Plaintiff must show that "a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate."  *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984); *see also* 42 U.S.C. § 1983 (holding liable any state actor who "subjects, or causes [a person] to be subjected" to a constitutional violation).  While a supervisor must have engaged in "some 'active unconstitutional behavior,'" that behavior need not be "'active' in the sense that the supervisor must have physically put his hands on the injured party or even physically been present at the time of the constitutional violation."  *Peatross v. City of Memphis*, 818 F.3d 233, 242–43 (6th Cir. 2016) (citations omitted) (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)).

A defendant may "knowingly acquiesce[] in the unconstitutional conduct of his subordinates through the execution of his job functions," *id.* at 242, including by failing to take precautions against likely violations. Thus, in assessing whether the director of a police department was liable for his officers' use of excessive force, we denied qualified immunity based on allegations that he "failed to train and supervise the officers to avoid the use of excessive force, failed to investigate the allegations of excessive force properly, and attempted to cover-up the unconstitutional conduct of his subordinates by exonerating the officers in an effort to escape liability." *Id.* at 243; *see also id.* (noting also that the defendant had previously acknowledged a need to review and improve the disciplinary process, but had not undertaken review or improvements). Similarly, in discussing a Title IX claim in the school context,[7] this Court has explained:

> [W]here a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances.

*Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000). This same reasoning applies here—where a defendant has knowledge that the methods she has used to address instances of abuse are ineffective, she does not take adequate precautions by simply continuing to use those methods.

However, a defendant may not be found to bear supervisory liability based on mere negligence:

> [I]t is not enough for the plaintiff to show that the defendant supervisors were sloppy, reckless or negligent in the performance of their duties. Rather . . . "[a] plaintiff must show that, in light of the information the defendants possessed, the teacher who engaged in . . . abuse showed a strong likelihood that he would attempt to . . . abuse other students, such that the failure to take adequate precautions amounted to deliberate indifference to the constitutional rights of students."

---

[7]The Supreme Court has explained that the standards for deliberate indifference under Title IX and § 1983 are comparable. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290–91 (1998); *accord Klemencic v. Ohio State Univ.*, 263 F.3d 504, 510 (6th Cir. 2001).

*Doe ex rel. Doe v. City of Roseville*, 296 F.3d 431, 439 (6th Cir. 2002) (third alteration in original) (quoting *Doe v. Claiborne County*, 103 F.3d 495, 513 (6th Cir. 1996)). "The likelihood of future harm may depend upon a showing that [a] supervisor 'was confronted with a widespread pattern of constitutional violations,' not merely isolated or 'sporadic' incidents." *Howard v. Knox County*, 695 F. App'x 107, 113–14 (6th Cir. 2017) (quoting *Doe v. Warren Consolidated Sch.*, 93 F. App'x 812, 821–22 (6th Cir. 2004)).

With this foundation laid, we turn to assess Plaintiff's supervisory liability claims, beginning with the claims against Defendants Bacon and Robinson.

## A.  Dismissal of Claims Against Defendants Bacon and Robinson

Plaintiff alleges in her complaint that Bacon and Robinson are liable for Duvall's violation of C.G.'s rights because, as principals of the Beekman Center while Duvall taught there, they received and inadequately responded to multiple complaints that Duvall was physically abusing students. The district court dismissed Plaintiff's claims, finding that "[a]ny action or inaction by Bacon and Robinson occurred years before the events at issue in this case, and neither of those defendants had any supervisory authority over Duvall at the time that he allegedly abused C.G."  (Op., R. 34 at PageID #491.)  On appeal, Plaintiff argues that these are not valid bases for dismissal.

Taking into account the circumstances involved in this case, we conclude that a lapse of time between a defendant's deliberately indifferent conduct and a plaintiff's injury does not necessarily preclude that defendant's supervisory liability—at least where the defendant had ample notice of the supervisee's likelihood of continuing violations, and the passage of time was not so great as to erase the connection between the supervisor's conduct and the student's subsequent abuse.  We note that Plaintiff's claims do not present a statute of limitations issue, as she pursued them promptly after C.G.'s injury.  In the instant case, the success of these claims instead turns on whether Plaintiff can show that Defendants actually and proximately caused C.G.'s injury, despite the time lapse between their alleged misconduct and Duvall's abuse of C.G.  For the reasons that follow, given the specific facts of this case and for the purposes of a motion to dismiss, Plaintiff has sufficiently shown that Defendants' alleged failure to carry out

their duties to report and investigate student abuse caused C.G.'s subsequent abuse. Accordingly, we reverse the district court's dismissal of Plaintiff's claims against Bacon and Robinson.

We review the grant of a motion to dismiss *de novo*. *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible only when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," thus raising "more than a sheer possibility that a defendant has acted unlawfully." *Id.* In reviewing the disposition of a motion to dismiss, this Court construes the complaint in the light most favorable to the plaintiff, accepts all well-pleaded factual allegations as true, and draws all reasonable inferences in her favor. *Cahoo v. SAS Analytics, Inc.*, 912 F.3d 887, 897 (6th Cir. 2019).

We must first contend with the district court's two grounds for dismissing Plaintiff's claims against Bacon and Robinson. Neither justifies dismissal. First, the simple fact that Bacon and Robinson's actions took place in years prior to Duvall's abuse of C.G. does not necessarily defeat Plaintiff's claims against them, which are not barred by the statute of limitations.[8] Regarding the second ground, Plaintiff's claims also are not barred by the fact that Bacon and Robinson did not have "any supervisory authority over Duvall at the time that he allegedly abused C.G." (*See* Op., R. 34 at PageID #491.) Just as a party need not have "been present at the time of the constitutional violation" in order to be found supervisorily liable, *Peatross*, 818 F.3d at 242, they need not have current supervisory authority over the alleged violator. If

---

[8]In § 1983 cases, "state law determines which statute of limitations applies," while "federal law determines when the statutory period begins to run." *Harrison v. Michigan*, 722 F.3d 768, 772–73 (6th Cir. 2013). Because § 1983 actions "are best characterized as personal injury actions," federal courts apply the statute of limitations governing personal injury actions in the state where the action was brought. *Wilson v. Garcia*, 471 U.S. 261, 280 (1985); *see also id.* at 275–76; *Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007). Thus, § 1983 claims brought in Michigan are subject to its three-year statute of limitations. *See* Mich. Comp. Laws § 600.5805(2). The statutory period begins to run "when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred." *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996). Accordingly, the earliest that Plaintiff's statute of limitations period could have begun to run is October 7, 2014, the day C.G. was injured by Duvall. Plaintiff filed her complaint on November 2, 2015, well within the three-year statute of limitations.

this were not the case, parties would become effectively immune from supervisory liability immediately upon leaving the relevant position of authority, even if a violation occurs just days later. This is not a logical result—if a supervisor has encouraged a violator's misconduct, the effects of that encouragement do not cease at the moment of the supervisor's departure. Moreover, this would encourage individuals to avoid liability for their supervisee's constitutional violations not by responding to them adequately, but by passing the supervisee down the line to a different supervisor—or, more relevantly, by simply transferring the supervisee to another school.

Instead, we ask whether Bacon and Robinson acted in a manner demonstrating deliberate indifference to the likelihood of Duvall's future abuse and, if so, whether their deliberately indifferent conduct caused his violation of C.G.'s rights. *See id.* (explaining that there must be "a causal connection between the defendant's wrongful conduct and the violation alleged" in order to find that a defendant bears supervisory liability under § 1983). As we have explained when discussing causation in the scope of employment discrimination and retaliation actions, "[a]lthough temporal proximity . . . is relevant to the question of whether there exists a causal connection" between two events, it is not dispositive. *Davis v. Rich Prods. Corp.*, 11 F. App'x 441, 445 (6th Cir. 2001); *accord, e.g.*, *Dixon v. Gonzales*, 481 F.3d 324, 335 (6th Cir. 2007) (explaining that "a mere lapse in time between" two events "does not inevitably foreclose a finding of causality" (citing with approval *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) ("It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case . . . ."))).

Thus, we must consider whether Defendants' conduct is a cause in fact and a proximate cause of C.G.'s injury. *See, e.g.*, *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007). "Cause in fact is typically assessed using the 'but for' test, which requires us to imagine whether the harm would have occurred if the defendant had behaved other than [she] did." *Id.* "[C]ourts have framed the § 1983 proximate-cause question as a matter of foreseeability, asking whether it was reasonably foreseeable that the complained of harm would befall the § 1983 plaintiff as a result of the defendant's conduct." *Id.* at 609. Foreseeability overlaps with the concept of "directness," which proximate cause also requires, since "[i]n most

cases the more directly related an outcome is to an underlying action, the more likely that the outcome will have been foreseeable, and *vice versa*." *Crosby v. Twitter, Inc.*, 921 F.3d 617, 624 (6th Cir. 2019) (quoting *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 392 (6th Cir. 2018)). "[S]ince 'we presume that general allegations embrace those specific facts . . . necessary to support the claim,' . . . causal weaknesses will more often be fodder for a summary-judgment motion under Rule 56 than a motion to dismiss under Rule 12(b)(6)." *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004) (quoting *NOW v. Scheidler*, 510 U.S. 249, 256 (1994)).

We turn, then, to Plaintiff's specific claims against Bacon and Robinson.

### 1. Defendant Sheryl Bacon

In her complaint, Plaintiff alleges that Bacon received reports that Duvall had slammed multiple students into tables and yanked students out of their seats in November 2003; that Duvall had slapped a student in April 2005; that he had pushed a child to the floor and scratched the child's face in March 2007; and that since 2004, he had slapped students, grabbed students by the neck, dragged students around the room, and squeezed students' faces. Beyond these specific reports, Plaintiff alleges that in 2010, Bacon received three to four additional reports that Duvall had been overly physical with students. Together, these reports represented approximately ten individual alleged instances of abuse, making them sufficiently consistent and numerous to plausibly allege that Bacon possessed information showing Duvall's strong likelihood of re-offense.

Confronted with this information, Plaintiff alleges, Bacon took no action to report or investigate allegations of abuse. She further complained that Bacon shredded her notes detailing reports against Duvall and actually threatened one individual with termination if she continued to make reports, thereby actively concealing Duvall's history. These allegations plausibly allege that, knowing about Duvall's history, Bacon failed to take adequate precautions to address the possibility of future abuse, *Roseville*, 296 F.3d at 439, and thus approved or acquiesced in this conduct, *Bellamy*, 729 F.2d at 241.

Defendants argue that Plaintiff's claims against Bacon are similar to those that this Court dealt within in *Doe ex rel. Doe v. City of Roseville* and *Doe v. Claiborne County*, and we should therefore affirm. But as we explained in *Howard v. Knox County*,

> In *Claiborne County*, we explicitly held that three supervisor-defendants carried out their statutory duty to supervise and report acts of misconduct, including by reporting allegations of sexual abuse to the appropriate child-welfare agency, removing the accused teacher from student contact during the pendency of the investigation, supervising later contact with students, and determining that the teacher in question had been "exonerated" of all previous charges. In *Doe v. City of Roseville*, we found that one of the supervisors filed a report with the child-welfare agency and believed that the abuse might be occurring at home, whereas the other supervisor did not become aware of a teacher's history of sexual misconduct until after the police launched an investigation.

695 F. App'x at 116 (citations omitted) (citing *Claiborne County*, 103 F.3d at 513; *Roseville*, 296 F.3d at 441). Unlike the defendants in *Claiborne County* and *Roseville*, Bacon allegedly took no action at all, despite receiving multiple complaints that made her aware of Duvall's misconduct—a clear failure to adequately respond, as her position required her to do.

Moreover, for the purposes of a motion to dismiss, these allegations suffice to suggest that Bacon's conduct caused C.G.'s injuries. Considering foreseeability, it is clearly foreseeable that if a teacher's ongoing physical abuse of students is not responded to, that teacher will continue to physically abuse students. Regarding directness, had Bacon reported and investigated the allegations against Duvall, some might have been found substantiated and sufficiently serious to warrant disciplinary action or termination. Alternatively, a response from Bacon might have discouraged Duvall from continuing to use physical force against students. Beyond Duvall's own decision to abuse students, there is apparently no intervening act in this chain of causation, and the causation is thus sufficiently direct. To be sure, the length of time between Defendant Bacon's alleged failures and C.G.'s abuse suggests that Defendants may be able to defeat Plaintiff's allegations in the end. For instance, Defendants may identify an intervening cause that terminated the chain of direct causation between Bacon's conduct and Duvall's abuse or that made it impossible for Defendant Bacon to foresee Duvall's continued abuse. *See, e.g.*, *Claiborne County*, 103 F.3d at 502, 513 (affirming the dismissal of a supervisory liability claim against a superintendent who participated in a decision to remove an

allegedly abusive teacher from student contact, as the school board subsequently decided to rehire the teacher after the superintendent left his position). But, especially since Defendants have not argued that point, this question is best left to the court on summary judgment or to the ultimate factfinders. Thus, at this stage, Plaintiff's claim against Bacon stands, and the district court's dismissal of it is reversed.

The partial dissent suggests that Plaintiff's complaint describes only three specific instances of alleged misconduct that were reported to Bacon. But reading the complaint in the light most favorable to Plaintiff and making all reasonable inferences in her favor, as we must, *Cahoo*, 912 F.3d at 897, it alleges far more than that. The reports it contends that Bacon received in November 2003, April 2005, and March 2007 together identified instances in which Duvall yanked students out of their seats, force-fed students, slammed multiple students into tables, slapped a student, and pushed a student to the floor to force candy out of his mouth. (First Am. Compl., R. 15 at Page ID ##188–89.) Construing the complaint in Plaintiff's favor, these each constitute separate instances of abuse, even if they were reported together. Moreover, the complaint additionally alleges that beginning in 2004, a paraprofessional "timely reported to Bacon" instances of abuse including "slapping and squeezing students[,] grabbing students by the neck, dragging students around the room, [and] squeezing students' faces." (*Id.* at #191.) Again, viewed in Plaintiff's favor, this constitutes several more instances of abuse. Finally, the complaint says that in early 2010, "another teacher reported to Principal Bacon on three to four occasions that Duvall was overly physical with students." (*Id.* at #189.) While this allegation may be insufficiently specific on its own, it also bolsters Plaintiff's allegations against Duvall. Altogether, viewed in the light most favorable to Plaintiff, we think these allegations detail sufficiently specific and sufficiently numerous instances of Duvall's abuse to put Bacon on notice of the likelihood that Duvall would abuse students in the future. To be sure, there are some overlapping details in the reports the complaint discusses, suggesting that they may in fact describe the same instances of misconduct. However, assuming as much at this stage would run counter to our duty to view the facts alleged in the light most favorable to Plaintiff and to make all reasonable inferences in her favor.

The partial dissent goes on to consider documents in the record which it suggests "do not always support . . . that these instances were reported to Bacon." But the documents that it discusses were not before the district court at the time that it considered Bacon's motion to dismiss, and so we cannot consider them in reviewing that dismissal. While those documents may be considered at the motion for summary judgment or trial phases, they do not provide reason to affirm the district court's dismissal.

### 2. Defendant Edna Robinson

Turning then to Plaintiff's claim against Robinson, Plaintiff alleges that Robinson had received complaints that, in October 2012, Duvall threw a drink carton at a student, yanked another out of her chair, squeezed and shook a student by the head and neck, and allowed another to defecate in his clothing rather than permit him go to the bathroom, as well as complaints that he threw a student into a bookcase in February 2014 and that he had done this several times before. Beyond this, Plaintiff alleges that an aide asked to be removed from Duvall's classroom because of abuse between 2010 and 2011 and that the school was asked not to place a student in Duvall's classroom based on reported abuse in October 2012. These represent several independent reports of abuse over a consolidated period of time leading up to the incident with C.G., a sufficiently widespread pattern to make Robinson aware of Duvall's likely future abuse.

Plaintiff further contends that, although Duvall was investigated and suspended for three days after grabbing a student by the neck and shaking her, Robinson failed to notify law enforcement, Protective Services, or victim guardians about this abuse. And Plaintiff alleges that Robinson failed to take *any* action in response to the other reports.[9] This plausibly suggests that Robinson failed to take adequate precautions in the face of a widespread pattern of violations. *Roseville*, 296 F.3d at 439.

---

[9]We note that some of these allegations may be undermined by evidence entered into the record after Robinson's dismissal, which was secured in discovery on Plaintiff's claims against Defendants Alwardt, Caamal Canul, and Nickson. However, in reviewing the district court's grant of a motion to dismiss, this Court considers the sufficiency of the facts pleaded by the plaintiff, not the facts later discovered. Had Plaintiff been allowed to continue her claim against Robinson, she might also have uncovered additional evidence that would have bolstered her case against Robinson at summary judgment.

Again, unlike the defendants in *Claiborne County*, Robinson allegedly let incidents go altogether uninvestigated or unaddressed, and, again unlike the defendants there, apparently never thought the allegations against Duvall unfounded or already dismissed. *See* 103 F.3d at 501–02, 513. And unlike the defendants in *Roseville*, Robinson allegedly never reported any abuse to child welfare, despite knowing of multiple instances of abuse, and never undertook investigations of multiple other incidents. *See* 296 F.3d at 434–35.

As before, Plaintiff's allegations are also sufficient to show causation at this stage. Had Robinson notified the requisite authorities about the choking incident or acted in response to other allegations against Duvall, those allegations may have been more thoroughly investigated and responded to, resulting in disciplinary action against or termination of Duvall. This is a sufficiently direct chain of causation. And again, Defendants present no reason for us to conclude, at this stage, that Defendant Robinson could not have foreseen C.G.'s injury. Thus, we also reverse the district court's dismissal of Plaintiff's claim against Defendant Robinson.

**B. Summary Judgment to Defendants Alwardt, Caamal Canul, and Nickson**

We next confront Plaintiff's claims against Defendants Alwardt, Caamal Canul, and Nickson. Plaintiff claims that these Defendants are liable for Duvall's violation of C.G.'s rights because they were responsible for reporting and responding to Duvall's misconduct, yet failed to take adequate precautions to prevent the continuation of that misconduct. The district court granted summary judgment to Defendants, finding that "[their] conduct was, at best, negligent and C.G. cannot sustain a section 1983 action against them." (Op. & Order Den. Summ. J., R. 132 at PageID #3469.) It did not reach the question of whether Defendants are entitled to qualified immunity. For the reasons set forth below, we find that the district court erred in granting summary judgment to Defendants and that Defendants are not entitled to qualified immunity.

We review the district court's grant of summary judgment *de novo*. *Minadeo v. ICI Paints*, 398 F.3d 751, 756 (6th Cir. 2005). Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Credibility determinations, the

weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### 1. Defendant Martin Alwardt

Plaintiff alleges that Defendant Alwardt, the District's Director of Special Education, demonstrated deliberate indifference to Duvall's abuse by not ensuring that reports of abuse were investigated, failing to follow up on the investigations that were conducted, actually chastising Duvall for failing to physically restrain students, not maintaining documentation of Duvall's abuse, and transferring Duvall to a new school despite knowing about his history of abuse. The evidence suffices to show a genuine issue of material fact as to whether Alwardt bore supervisory liability for Duvall's abuse of C.G.

Considering first the information that Alwardt possessed about Duvall's history of abuse, Alwardt stated in his deposition that the district files did not include any information on Duvall's alleged abuse prior to October 2012, when Dove reported that Duvall had engaged in series of abusive acts culminating in choking a student. Plaintiff argues that information about this pre-October 2012 abuse must have been available to Alwardt because it was ultimately produced in response to their FOIA requests. But regardless of whether Alwardt had information about Duvall's abuse prior to October 2012, the evidence supports a reasonable inference that Defendant Alwardt received enough information about Duvall's misconduct between October 2012 and October 2014 to demonstrate his strong likelihood of abusing other students. *See Claiborne County*, 103 F.3d at 513. Viewed in the light most favorable to Plaintiff, the record suggests that Alwardt received at least the following complaints during that time: Ellenwood's April 2012 report that Duvall pushed a student into the wall, pressed on a student's jaw to get her to stop making noises, and generally used physical force with students; Ellenwood's October 2012 follow-up letter expressing her dissatisfaction that her reports of abuse were not adequately investigated; the timeline of abuse allegations Ellenwood provided to Alwardt in an August 2014 meeting; Defendant Robinson's "inconclusive" report on her informal investigation of a parent's complaint that Duvall had bruised a student; Dove's October 2012 complaints of four instances

of abuse, which culminated in Duvall choking a student; CMH's "firestorm" of complaints that Duvall had physically abused students from October 2012; Mid-Michigan Guardianship Services' request that a student not be placed in Duvall's classroom; reports of the February 2014 incident involving Duvall throwing another student into a bookcase; and independent requests from parents and guardians asking to move their students out of Duvall's classroom.

Altogether, these complaints represented allegations of approximately fifteen different instances of abuse by Duvall over a period of three years. Taken together, this is far more than "isolated" or "sporadic" incidents of abuse. *Howard*, 695 F. App'x at 113–114. Instead, Alwardt was confronted with a widespread pattern of alleged abuse, putting him on notice that Duvall had a strong likelihood of future abuse. Moreover, Plaintiff has raised a genuine issue of material fact as to whether Alwardt knew that Duvall told Robinson that he would continue to use force even after the October 4, 2012 incident. This conversation would provide Alwardt with additional notice that Duvall was likely to abuse students in the future.

The record further presents genuine issues of material fact as to whether, armed with this knowledge, Alwardt still failed to take adequate precautions to ward off Duvall's future abuse. *See Claiborne County*, 103 F.3d at 513. Alwardt was jointly responsible for training special education teachers and responding to concerns about their performance. Likewise, according to Parks, Alwardt was responsible for following up on his investigative reports and authorizing future investigations. Despite this, Alwardt admitted that he did not even review investigative reports on Duvall's abuse, raising a genuine issue as to whether Alwardt fulfilled his duty with regard to allegations against Duvall. *See, e.g.*, *Peatross*, 818 F.3d at 243 (denying qualified immunity in part based on allegations that the defendant failed to supervise officers alleged to have used excessive force and failed to investigate allegations of excessive force properly). Likewise, the record presents a genuine issue as to whether Alwardt himself was responsible for the District's failure to investigate other complaints made against Duvall, including Ellenwood's allegations that Duvall physically abused students and the additional reports of abuse that Parks uncovered in his investigation of Dove's 2012 allegations.

While it is evident, as Defendants argue, that Alwardt took some action in response to instances of Duvall's alleged abuse, these minimal responses do not eliminate any genuine issue

of material fact as to whether he demonstrated deliberate indifference to the possibility of Duvall abusing students in the future. Defendants note that Alwardt reported instances of Duvall's misconduct to HR. But even if true, Duvall continued to engage in abuse even after these reports, and many allegations against Duvall were not addressed even after being reported to HR. Moreover, if Alwardt himself was responsible for following up on HR reports, the fact that he simply reported Duvall's misconduct to HR does not show that he took adequate precautions. Defendants also argue that Alwardt recommended that Duvall be suspended following the October 2012 incident. But again, upon Duvall's return to teaching after his short suspension, allegations continued to come in against him, providing Alwardt with notice that this "remedial action [was] inadequate and ineffective." *Vance*, 231 F.3d at 261. Despite this, Alwardt continued to simply refer claims against Duvall to HR, raising a genuine dispute as to whether, by "continu[ing] to use those same methods to no avail," he failed to act reasonably. *Id.*

Moreover, the record demonstrates genuine issues as to whether Alwardt actually responded to Duvall's conduct in other ways Defendants suggest. For instance, although Defendants say that Alwardt chastised Duvall following the October 2012 incident and told him to undergo additional crisis intervention training, Duvall testified that Alwardt never discussed any complaints about Duvall's use of force with him prior to the incident with C.G. and had actually chastised him when he failed to use physical restraints. This raises another genuine issue as to whether, even when confronted with Duvall's history, Alwardt encouraged Duvall to use force more frequently.

Finally, Defendants say that Alwardt had Duvall transferred to Gardner in response to a "firestorm" of allegations against him. But in *Doe v. Warren Consolidated Schools*, we concluded that a defendant's action to transfer an abusive teacher to a different school, despite his knowledge that the teacher posed a danger to students, "constituted 'knowing acquiescence' to abuse." 93 F. App'x at 821; *accord Howard*, 695 F. App'x at 109, 115–16 (finding defendants had "heightened the risk of harm to the plaintiff" where they had transferred him to the plaintiff's class despite knowledge of his history of abuse). Again, viewing the evidence in Plaintiff's favor, Alwardt's decision to place Duvall in a new school, where his colleagues had less notice of his history, raises a genuine issue as to whether Alwardt was deliberately

indifferent to the possibility of future abuse. Moreover, the record suggests that upon transferring Duvall to Gardner, despite having received multiple reports against Duvall and knowing that he had been suspended based on one, Alwardt assured Gardner's principal, Defendant Nickson, that Duvall was known to be a good teacher and that none of the allegations against him had been substantiated. This, too, arguably further increased Duvall's risk of additional abuse.

Defendants again contend that *Roseville* and *Claiborne County* require this Court to affirm the district court's judgment as to Alwardt. We disagree. The record suggests that Alwardt was presented with many more specific reports of abuse than were any of the administrators in *Roseville* or *Claiborne County*. *See Warren Consolidated Sch.*, 93 F. App'x at 821 (concluding that *Roseville* was "easily distinguishable" from the case at hand where the relevant teacher's misconduct "was repeated and recent, as opposed to sporadic"); *Howard*, 695 F. App'x at 114 (denying qualified immunity where "Plaintiffs point[ed] to numerous examples where parents and students complained to [the defendant] about *specific* incidents of abuse witness or otherwise discovered, not just a generalized fear of potential abuse"). Some of these instances were admitted and others substantiated, providing reason to conclude that Alwardt knowingly acquiesced in Duvall's abuse. *See Warren Consolidated Sch.*, 93 F. App'x at 821. In *Claiborne County*, on the other hand, the defendant school administrators understood that prior charges of sexual abuse against a teacher who went on to abuse the plaintiff were "unfounded," had resulted in an "exoneration," or had been dismissed. 103 F.3d at 503.

Likewise, in *Roseville*, the defendant school administrators did not believe reports of abuse by the teacher who went on to abuse the plaintiff or, after investigation, found there were "plausible explanations" for the teacher's conduct. 296 F.3d at 435. In *Warren Consolidated Schools*, we contrasted the defendant's knowledge with that in *Roseville*, explaining that the defendant "knew that [the teacher] posed a danger to young girls," but nevertheless continued to expose students to that danger by choosing to transfer the teacher to a school that young girls attended. 93 F. App'x at 821. Similarly, in this case, Alwardt was presented with approximately fifteen reports of abuse over a period of three years, and he acknowledged that Duvall presented a danger to students. (Alwardt Dep., R. 112-24 at PageID #2892 (noting that Alwardt

recommended to HR that Duvall be closely monitored because of the number of allegations against him).)

Altogether, we are faced with evidence that raises questions as to whether Alwardt failed to fulfill his obligation to review investigatory reports, failed to investigate other allegations, exposed students to additional risk by transferring Duvall to a new school, and actually verbally encouraged the use of force. This evidence demonstrates a genuine issue of material fact as to whether Alwardt knowingly acquiesced in or was deliberately indifferent to the possibility that Duvall would continue his abuse. Plaintiff's claim against Alwardt thus withstands summary judgment, and the district court erred in concluding otherwise.

### 2. Defendant Yvonne Caamal Canul

Plaintiff next argues that Defendant Caamal Canul, the District's Superintendent, demonstrated deliberate indifference to Duvall's abuse by not ensuring that allegations against Duvall were investigated and addressed and by not following up on complaints she received about him. Plaintiff has also presented sufficient evidence to withstand summary judgment on her claim that Caamal Canul bore supervisory liability for Duvall's abuse of C.G.

Like Alwardt, Caamal Canul possessed information showing that Duvall had a strong likelihood of abusing other students before October 7, 2014. Viewed in the light most favorable to Plaintiff, the record suggests that Caamal Canul had been informed of at least the following allegations against Duvall: Ellenwood's April 2012 complaint, including allegations that Duvall had pressed on a student's face to quiet him or her and pushed another into a wall, in addition to general allegations of Duvall being physically rough with students; Ellenwood's subsequent complaints about the District's failure to investigate of her abuse reports; Mid-Michigan Guardianship Services' letter requesting that a student not be placed in Duvall's classroom; and CMH's October 2012 complaints, which themselves referenced the October 4 incident in which Duvall choked a student and other instances in which Duvall dunked a student's head under water and students returned home bruised. In her deposition, Caamal Canul agreed that she received multiple complaints against Duvall within the first few months of being superintendent and that the behavior Duvall allegedly engaged in could prompt termination. Thus, Caamal

Canul was presented with several specific reports of abuse over a short period of time close to the C.G. incident. Caamal Canul did not express that she disbelieved any of these reports, found them unsubstantiated, or altogether dismissed them. Especially given the short period of time that Caamal Canul had been in the district at that point, these allegations are not "isolated" and "sporadic," but appear consistent and widespread. *See Howard*, 695 F. App'x at 113–14.

Moreover, the record suggests that two of the complaints of which Caamal Canul was made aware—those from Ellenwood and CMH—alleged that the District had insufficiently investigated, addressed, and reported prior instances of misconduct, further putting Caamal Canul on notice that the instances reported were not the only possible instances of abuse by Duvall. Thus, to the extent that Caamal Canul was not informed of more incidents of Duvall's abuse, this was because of her own failure to inquire into whether allegations against him were indeed adequately investigated and reported. Supervisors may not "turn a blind eye [to misconduct] for fear of what they might see" and then claim they were not liable because they did not see. *Roseville*, 296 F.3d at 440 (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001)). The fact that Caamal Canul had received reports that complaints against Duvall had not been sufficiently investigated also provided her reason to conclude that additional incidents may have taken place.

Plaintiff has further raised a genuine issue of fact as to whether, confronted with this knowledge, Caamal Canul fulfilled her obligations to address it. Caamal Canul acknowledged in her deposition that she had responsibility for ensuring student safety, for ensuring teachers were trained on mandatory reporting requirements and how to prevent child abuse, for establishing and administering a system for reporting employee misconduct, and for generally ensuring the District's compliance with Michigan law. CMH specifically reported that the District had failed to notify CMH, a student guardian, or protective services about alleged instances of abuse, and that parents' requests for information about alleged instances of abuse had gone unanswered. Despite this, the record suggests that Caamal Canul did not confirm that the District was indeed notifying the legally required parties of allegations, but simply passed the report to her subordinates to follow up without instruction. She also heard that Ellenwood was dissatisfied with the District's investigation of her reports. Similarly, the record suggests Caamal Canul did

nothing to confirm that prior investigations were indeed thorough, let alone to confirm that other alleged incidents had been sufficiently investigated.

Thus, when Caamal Canul was put on notice, by both Ellenwood and CMH, that the systems she was responsible for were failing, she simply continued to channel reports into those systems by referring the complaints to HR employees and subordinates without follow-up. This raises a genuine dispute of material fact as to whether Caamal Canul acquiesced in Duvall's continued abuse of children. If a defendant knows that her previous action to address alleged violations was inadequate and ineffective, simply repeating those same actions may constitute deliberate indifference. *Vance*, 231 F.3d at 261. Accordingly, the district court erred in granting summary judgment to Defendant Caamal Canul.

### 3. Defendant Connie Nickson

Plaintiff contends that Defendant Nickson, the principal of Gardner at the time Duvall abused C.G., demonstrated deliberate indifference to the possibility of Duvall's future abuse by failing to act on evidence suggesting he had thrown a student into a bookcase, failing to speak with Duvall about this incident, failing to inquire into Duvall's history of physical abuse, failing to ensure that Duvall was properly trained on using physical force with students, failing to develop an improvement plan for Duvall, and by actively encouraging his misconduct. Again, Plaintiff has demonstrated a genuine issue of material fact as to whether Defendant Nickson bore supervisory liability for Duvall's abuse of C.G.

Like Alwardt and Caamal Canul, Defendant Nickson possessed information showing Duvall's widespread pattern of abusing children well before October 2014. Specifically, viewed in the light most favorable to Plaintiff, the evidence suggests she had heard about Duvall's historical "issues with [being] hands on" with students as of when he was transferred to Gardner, (Nickson Dep., R. 112-30 at PageID ##3178–79); the February 2014 report about Duvall throwing a student into a bookcase; other reports of Duvall throwing students that came out in the investigation of the February 2014 incident; and that a student had been pulled from Duvall's classroom in May 2014 because the student's mother perceived it to be an unsafe environment. Again, these include multiple specific reports of abuse—some substantiated—over a short period

of time soon before Duvall's abuse of C.G.   While investigations concluded that there was insufficient evidence of some of these allegations, again none were considered unfounded, nor was Duvall exonerated in any of them.   This is enough to raise a genuine issue of material fact as to whether Nickson possessed information about a widespread pattern of abuse.

Defendants argue that Nickson notified HR about any reports of abuse that she received. But Nickson could not confirm any of the specifics of her reports to HR—whom she spoke to, when, or how she made that notification—instead only speaking to what she "would have" done. (*Id.* at ##3176–77, 3180–81.)   Viewed in the light most favorable to Plaintiff, this raises a question of whether Nickson notified HR at all.   Similarly, Nickson could not confirm that she notified the parents of the victims or law enforcement, as required, or that she conducted any additional investigation of the incidents.   Nickson also could not recall speaking with Duvall about the February 2014 incident and, when asked if she did anything to prevent future incidents like this, she said that she simply "assumed he was okay to work" based on HR's word.   (*Id.* at #3179.)

The record further allows the reasonable inference that Nickson actively encouraged Duvall's misconduct and abuse of children.   Despite finding Duvall's history of abuse concerning, (*id.* at ##3179, 3181), Nickson consistently provided strong positive reviews of Duvall, (*see, e.g.*, Alwardt Dep., R. 112-24 at PageID #2890 (noting that Nickson said Duvall was "an excellent teacher," "a team player willing to take on tasks, and help out in any way," and "good for the building")).   In conducting Duvall's performance review after the February 2014 incident, Nickson gave him a perfect score on classroom management.   This conduct also raises a genuine issue of material fact as to whether Nickson condoned Duvall's alleged behavior.

Together, the record evidence more than suffices to allow Plaintiff's claim that Nickson bore supervisory liability for C.G.'s abuse to stand.   The district court erred in concluding otherwise.

### 4. Qualified Immunity

Having found that the district court erred in its analysis of whether Defendants committed a constitutional violation, we next consider whether summary judgment was instead appropriate

on grounds of qualified immunity. The district court did not reach the question of qualified immunity, but "[t]his court can affirm a decision of the district court on any grounds supported by the record, even if different from those relied on by the district court." *Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir. 1999) (per curiam); *see also Sigley v. City of Parma Heights*, 437 F.3d 527, 536 (6th Cir. 2006) (noting that the district court did not address qualified immunity, but nonetheless considering it as it "presents a purely legal issue").

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In deciding if an official is entitled to qualified immunity, we generally employ the two-step inquiry laid out in *Saucier v. Katz*, 533 U.S. 194 (2001). Thus, we ask whether, viewing the facts alleged in the light most favorable to the injured party and resolving genuine disputes of fact in her favor, the facts "show the officer's conduct violated a constitutional right." *Id.* at 201. We then consider "whether the right was clearly established." *Id.* We may exercise our discretion to decide in what sequence to address these questions. *Pearson*, 555 U.S. at 236.

As discussed above, under the standards applied at the summary judgment stage, Plaintiff has shown that Alwardt, Caamal Canul, and Nickson did violate a constitutional right.[10] The question is now whether this right was clearly established. Generally speaking, "[i]t is well established that persons have a [F]ourteenth [A]mendment liberty interest in freedom from bodily injury." *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987); *see also Howard*, 695 F. App'x at 113. Likewise, C.G. "had a clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity." *Claiborne County*, 103 F.3d at 507. We have applied that right in the context of both sexual abuse, *see id.*, and physical abuse of students, *see Howard*, 695 F. App'x at 113.

---

[10]Defendants do not assert that Bacon and Robinson are entitled to qualified immunity, and so this issue is not preserved for our review. (Def. Br. at 23; *see also id.* at 1 n.1 (noting that "the Administrators" refers to Alwardt, Caamal Canul, and Nickson); *id.* at 42–46 (arguing that the Administrators are entitled to qualified immunity).)

However, we may only deny qualified immunity if "[t]he contours of the right . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). We thus consider "'whether the violative nature of *particular* conduct is clearly established' . . . 'in light of the specific context of the case, not as a broad general proposition.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (first quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); and then quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). The Supreme Court has clarified that "the very action in question" need not have been previously held unlawful, but "in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640.

In *Warren Consolidated Schools*, we concluded that the defendant was not entitled to qualified immunity upon finding that he was confronted with a widespread pattern of allegations of abuse by a teacher. 93 F. App'x at 822–23. We found it significant that the defendant did not claim that he disbelieved the abuse allegations made against the teacher in question and that the defendant acknowledged that the teacher's behavior was inappropriate and dangerous to students. *Id.* We concluded that a reasonable official would thus know that his actions were unlawful, and denied qualified immunity. *Id.* In this case, too, we are faced with three Defendants who agreed that Duvall's alleged conduct was concerning and harmful to students. Likewise, the Defendants do not claim that they disbelieved the allegations against Duvall. Yet the record suggests Defendants alternately funneled any reports about Duvall's conduct into the same system that had failed to adequately respond to Duvall's conduct, encouraged Duvall to use more physical restraints, placed Duvall in classrooms alongside colleagues who were not made aware of his history, and even provided glowing reviews of his management style. We conclude that a reasonable official in any of Defendants' positions would know that his or her response to Duvall's abuse was insufficient and unlawful. Defendants therefore are not entitled to qualified immunity.

Because the district court's grant of summary judgment in favor of Alwardt, Caamal Canul, and Nickson also cannot be upheld on this alternative ground, we reverse that judgment.

## II. Motion to Amend

After the district court dismissed Plaintiff's initial claims against the District,[11] Plaintiff filed a motion to amend her pleadings to add a claim that the District maintained customs, policies, and practices demonstrating deliberate indifference to C.G.'s right to bodily integrity that proximately caused his injury. *See Monell*, 436 U.S. at 694. The district court denied Plaintiff leave to amend. We review that denial for an abuse of discretion. *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002).

Following its first amendment of a pleading or after twenty-one days following service of that pleading, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). However, when a party seeks to amend its pleadings or join additional defendants after the expiration of scheduling order deadlines, it must show good cause under Rule 16(b). *Inge*, 281 F.3d at 625; *see also* Fed. R. Civ. P. 16(b)(4) (stating that the trial "schedule may be modified only for good cause and with the judge's consent"). "The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet" the scheduling order's requirements, but courts also consider "possible prejudice to the party opposing the modification." *Inge*, 281 F.3d at 625 (quoting *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001)).

Plaintiff filed her motion to amend the complaint on June 20, 2017. This was almost nine months after the scheduling order's deadline for motions to join parties or amend pleadings. In an attempt to show good cause for her delay, Plaintiff explained that her motion was grounded in new evidence she discovered when she deposed Duvall following that deadline. The district court found that Plaintiff had not shown good cause because she "had all the information [she] needed to timely allege *Monell* claims against [the District], both at the time [she] filed [her] initial complaint and prior to the expiration of the deadline for amendments," and thus "[could

---

[11]Plaintiff originally asserted claims against the District for violations of the Americans with Disabilities Act, section 504 of the Rehabilitation Act of 1973, and the Michigan Persons with Disabilities Civil Rights Act. The district court subsequently dismissed each of these claims, and Plaintiff does not challenge those dismissals on appeal.

not] show that, despite [her] diligence, [she] could not have met the deadline for amendments in the Case Management Order." (Order Den. Pl. Mot. to Amend Compl., R. 90 at PageID #975.)

The district court did not abuse its discretion in so finding. Plaintiff's proposed *Monell* claim was based on the District's alleged failure to investigate or act upon complaints against Duvall, failure to take appropriate disciplinary action against Duvall, and failure to report instances of abuse to appropriate authorities as legally required. Although Plaintiff claims that she discovered these failures only upon deposing Duvall on May 4, 2017, Plaintiff's First Amended Complaint actually detailed these same allegations. Moreover, evidence provided to Plaintiff on April 10, 2015, more than a year prior to the scheduling deadline, included information about the District's investigations—or lack thereof—into Duvall's prior misconduct and the disciplinary action taken against him. And Plaintiff received information about the District's policies regarding seclusion and the use of force by at least September 29, 2016, when Defendants submitted their Rule 26(a)(1) disclosures. Plaintiff cannot show that her *Monell* claim against the District was unavailable prior to Duvall's deposition, and thus has not shown good cause for her delay.

Although the district court did not explicitly address whether allowing Plaintiff's delayed amendment would prejudice the Defendants, it is clear that it would. "The longer the delay, the less prejudice the opposing party will be required to show." *DuBuc v. Green Oak Township*, 312 F.3d 736, 752 (6th Cir. 2002). With her motion, Plaintiff sought to rejoin a party against whom all claims had been dismissed a year before. While several District administrators remained involved in the case, the District had a separate interest in the case. Protecting that interest could require new depositions of individuals who had already been deposed, additional discovery, and additional delay to allow District attorneys to familiarize themselves with the updated record. Even assuming Defendants would be less prejudiced than they might otherwise have been because District administrators were still involved in the lawsuit, this still presented considerable reason to find prejudice.

Plaintiff could not justify her late motion to amend the complaint by showing either good cause or a lack of prejudice. Thus, the district court did not abuse its discretion in denying that motion. We affirm its decision.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's dismissal of Plaintiff's claims against Defendants Bacon and Robinson and its grant of summary judgment to Defendants Alwardt, Caamal Canul, and Nickson, **AFFIRM** its denial of Plaintiff's motion to amend her pleadings, and **REMAND** for further proceedings consistent with this opinion.

_____

**CONCURRING IN PART AND DISSENTING IN PART**

_____

BOGGS, Circuit Judge, concurring in part and dissenting in part. Sheryl Bacon retired as Principal of the Beekman Center at the end of the 2010–11 school year. More than three years later, as set forth in the court's opinion, a student was (as alleged) physically abused by his teacher, Lester Duvall, at a different school. Duvall had taught at Principal Bacon's school for many years, through the time of her retirement.

As set forth in the court's opinion, there were three specific instances of alleged misconduct by Duvall at Beekman, in 2003, 2005, and 2007. (*See* op. at 3). In each instance, the opinion and complaint use the term "reported" for these incidents, although the documents in the record do not always support a direct statement that these instances were reported to Bacon.

The documents consist of either typed or handwritten statements, with no indication that they were mailed or delivered to anyone. One set, for the 2007 incident, are not headed in any way. A second set of two statements, about the 2005 incident, are headed "To Whom It May Concern." The third document is in the form of a letter addressed to "David," with no indication of who that might be, concerning a 2003 incident. Only one statement, which is one of the two from 2005, adverts to the author speaking to Bacon, as accurately reported at page 3 of the court's opinion.

There are also statements made later, long after Bacon had retired, by Rezan Ellenwood and others, stating, in general terms, that the person had reported misconduct by Duvall to Bacon, without effect.

The legal question is whether, even at the motion-to-dismiss stage, allegations of three specific instances of unaddressed abuse over an eight-year period, along with more general statements, can suffice to support the possibility of liability for a principal for events that occurred more than three years after the principal retired. In my view, the chain of any possible causation is simply too attenuated to sustain that burden. Otherwise, any educational official who does not respond appropriately to misconduct by an underling can be held liable for that

person's misconduct in other locations, apparently into perpetuity. I do not read our precedents as supporting that degree of boundless liability, and I therefore respectfully dissent as to reversing the district court's judgment dismissing the suit against Principal Bacon. In all other respects I concur in the court's opinion.